IN THE MATTER OF EGG HARBOR ASSOCIATES (BAYSHORE CENTRE); IMPOSITION OF CONDITIONS OF COASTAL AREA FACILITY PERMIT # CA 79–0231–5.

Argued May 10, 1983—Decided August 1, 1983.

360

*Robert N. McAllister* argued the cause for appellant, Egg Harbor Associates (*Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz,* attorneys; *Lewis J. Smith,* on the briefs).

*John M. Van Dalen,* Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Deborah T. Poritz,* Deputy Attorney General, of counsel).

*Kenneth E. Meiser,* Deputy Director, Division of Public Interest Advocacy, argued the cause for *amicus curiae* Department of the Public Advocate (*Joseph H. Rodriguez,* Public Advocate, attorney).

*Stewart M. Hutt* submitted briefs on behalf of *amicus curiae* New Jersey Builders Association (*Hutt, Berkow, Hollander & Jankowski,* attorneys; *Stewart M. Hutt* and *Glenn C. Kienz,* on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

The principal issue in this case is whether the Division of Coastal Resources (Division) of the Department of Environmental Protection (DEP) may condition its approval of a proposed development within the coastal zone on the construction of a certain number of low and moderate income housing units. Here, the Division required a developer, Egg Harbor Associates

(Associates), to set aside 10% of the residential units for low income housing and 10% for moderate income housing.

The Appellate Division held that the Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 to –21 (CAFRA), empowers the Division to impose "fair share" housing conditions and that the Division's exercise of this power was constitutional. 185 *N.J.Super.* 507 (1982). Associates perceives CAFRA as a purely environmental statute, and in its petition for certification contends that the Division exceeded its statutory authority by using CAFRA to achieve another social goal, providing needed low and moderate income housing. Associates argues further that the Division's actions were based on an impermissibly vague delegation of legislative power and that forcing a developer to build low and moderate income housing is an unconstitutional taking of property without compensation.

We granted Associates' petition for certification, 91 *N.J.* 552 (1982), and now affirm the judgment of the Appellate Division.

I

Associates is the owner of a 127.644-acre tract in Egg Harbor Township, Atlantic County, on which it proposes to build a residential community of 1,530 units, a 500-room hotel, a 300-slip marina, a 22-story office building, and 4,200 parking spaces. The tract is located in a "development region" (formerly designated as a "high growth" area) of the coastal area in the "Absecon-Somers Point Development Region," *N.J.A.C.* 7:7E–5.-3, near Atlantic City.

On March 30, 1979, Associates first submitted a CAFRA application to DEP for construction of the development. Because the tract is located within the "coastal area," *N.J.S.A.* 13:19–3, and because the development constitutes a "facility" under *N.J.S.A.* 13:19–3(c)(5), a DEP permit is required. *N.J. S.A.* 13:19–6.

On April 30, 1979, DEP responded in a letter outlining various deficiencies in the application. Among the comments was the following:

Given the magnitude and variety of uses proposed for Bayshore Centre and the rental schedule and anticipated sales prices for the proposed apartments and townhouses, it seems appropriate that the developer address the question of fair share and least cost housing. Therefore, please present to this Division an analysis which justifies the contribution made by the project towards meeting the *full range* of housing needs in Egg Harbor Township and the region (Atlantic County) (emphasis in original).

This request was consistent with the then applicable "fair share housing" rule, *N.J.A.C.* 7:7E–8.6, which mandated that new developments "provide least cost housing where feasible," and encouraged developments that contributed to a municipality's meeting its fair share housing obligations under *Southern Burlington Cty. NAACP v. Mt. Laurel Tp. (Mt. Laurel I)*, 67 *N.J.* 151 (1975), *app. dism.*, 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975). In response to that request, Associates submitted comments concerning the feasibility of low and moderate income housing within the development and off-site commitments contemplated by Associates to provide least cost housing within the region. Following various revisions, the application was deemed complete on September 27, 1979, and a public hearing occurred on December 6 in the Township of Egg Harbor. Testifying in support of the project was, among others, the mayor of the township, which had already granted its approval of the development under its zoning ordinances.

On August 29, 1980, the Division issued to Associates a conditional permit for construction of the Bayshore Centre. The subject of this litigation concerns the requirement in the permit that of the 1,530 proposed housing units 10% shall be low income units and 10% shall be moderate income units. The procedural history following the issuance of the permit was summarized by the Appellate Division:

The conditional permit was thereupon issued to Associates under date of August 29, 1980. Associates was advised that it had two avenues of appeal: to the Coastal Area Review Board whose role is restricted 'to the declaration of public policy concerning the development of the coastal area' (*N.J.A.C.* 7:7D–1),

or to the DEP Commissioner by 'a plenary (quasi-judicial) hearing before a hearing officer' who would 'make findings of fact, conclusions of law and recommendations to the Commissioner on whether to affirm, modify, or reverse' the decision of the Division of Coastal Resources. *N.J.A.C.* 7:7D–2.8.

Associates elected not to request a plenary hearing before a hearing officer and waived that right by seeking a review before the Coastal Area Review Board. *N.J.A.C.* 7:7D–2.8(a). However, because of apparent miscommunication between the Attorney General and Associates, no hearing before the Coastal Area Review Board was conducted and this appeal was filed. During the pendency of the appeal the Attorney General moved to remand the matter to the Coastal Area Review Board to conduct the omitted hearing; the remand was objected to by Associates and denied by this court. [185 *N.J.Super.* at 514–15].

## II

The primary purpose of CAFRA is to protect the unique and fragile coastal zones of the State. Through CAFRA, the Legislature intended to reverse "serious adverse environmental effects ... that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State." *N.J.S.A.* 13:19–2. To achieve this goal, the Legislature determined that

all of the coastal area should be dedicated to those kinds of land uses which promote the public health, safety and welfare, protect public and private property, and are reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area. [*Id.*].

Associates contends that neither these legislative findings nor any specific provisions of the act supports the conclusion that the Legislature empowered DEP to require low and moderate income housing for approval of a CAFRA permit. We disagree.

Although CAFRA is principally an environmental protection statute, the powers delegated to DEP extend well beyond protection of the natural environment. Succinctly stated, the delegated powers require DEP to regulate land use within the coastal zone for the general welfare.

Many of CAFRA's provisions illustrate the nature of its regulatory functions. First, in determining whether to issue a

permit, the commissioner of DEP is to consider many diverse factors, including trash disposal, interference with natural life processes, and degradation of unique or irreplaceable land types (including historical or archeological areas). *N.J.S.A.* 13:19–10. More to the point, the commissioner must determine whether the facility "[i]s located or constructed so as to neither endanger human life or property nor otherwise imrair the public health, safety, and welfare." *N.J.S.A.* 13:19–10(f).

Second, the statute requires the commissioner to develop strategies "which take into account the paramount need for preserving the environmental values and the legitimate need for economic and *residential* growth within the coastal area." *N.J. S.A.* 13:19–16 (emphasis added). The same section expressly provides that "[t]he environmental design ... shall include a delineation of various areas appropriate for the development of *residential* and industrial facilities of various types ...." *Id.* (emphasis added). Pursuant to the statutory mandate, DEP has promulgated regulations implementing the legislative policy. *N.J.A.C.* 7:7E–1.1 to –8.26. The rule in effect at the time of the issuance of the permit "encouraged" the construction of low and moderate income housing and stated that "[h]ousing developments shall provide least cost housing where feasible." Since that time the rule has been modified, and in its present form, which is more detailed than the original version, it requires new residential developments to "provide an appropriate amount of affordable housing for low and moderate income households where needed and feasible." An explanation of the rationale for the rule recites that in recent decisions DEP has determined that major developments must provide at least 10% of the units for low income households and at least 10% for moderate income households.

Third, the act expressly empowers the commissioner either to deny or grant conditionally a permit for construction of a facility that violates the purposes of the statute. *N.J.S.A.* 13:19–11. In its findings, the Legislature emphasized the unique environmental qualities of the coastal area and stated "it

is in the interest of the people of the State that all of the coastal area shall be dedicated to those kinds of land uses which promote the public health, safety and welfare . . . ." *N.J.S.A.* 13:19–2.

Our determination whether the legislative mandate includes the authority to require the provision of low and moderate income housing begins with the fundamental principle that land use regulation, as one aspect of the State's police power, should be used to promote the general welfare. *See, e.g., Lusardi v. Curtis Point Prop. Owners Ass'n,* 86 *N.J.* 217, 226 (1981); *Taxpayers of Weymouth Tp. v. Weymouth Tp.,* 80 *N.J.* 6, 20–21 (1976), *app. dism.,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.* 2d 373 (1977); *Mt. Laurel I, supra,* 67 *N.J.* at 174. In its discretion, the Legislature may delegate this power to municipalities or to state agencies. *See Meadowlands Reg. Redevelopment Agency v. State,* 63 *N.J.* 35, 46, *app. dism.,* 414 *U.S.* 991, 94 *S.Ct.* 343, 38 *L.Ed.2d* 230 (1973). As Chief Justice Wilentz recently stated with respect to the power of municipalities to zone in furtherance of the general welfare,

> [i]t would be useful to remind ourselves that the doctrine does not arise from some theoretical analysis of our Constitution, but rather from underlying concepts of fundamental fairness in the exercise of governmental power. The basis for the constitutional obligation is simple: the State controls the use of land, *all* of the land. [*Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp. (Mount Laurel II),* 92 *N.J.* 158, 209 (1983)].

Here, the specific question is whether the Legislature has delegated to DEP, a state agency, the power to require a fixed percentage of low and moderate income housing as a prerequisite for granting a construction permit within the coastal zone.

Enabling statutes delegating to municipalities the power to enact ordinances to promote the health, safety, and general welfare in the context of land use regulation should be given "an expansive interpretation." *Taxpayers Ass'n of Weymouth Tp., supra,* 80 *N.J.* at 21; *cf. DeSimone v. Greater Englewood Housing Corp. No. 1,* 56 *N.J.* 428, 442 (1970) (low and moderate income housing is a "special reason" justifying a use variance). With respect to the scope of municipal land use regulations, the

general welfare includes zoning for a planned housing develop-
ment for the elderly, *Shepard v. Woodland Tp. Committee and
Planning Bd.,* 71 *N.J.* 230 (1976), and a trailer park for the
elderly. *Taxpayers Ass'n of Weymouth Tp., supra.* Similarly,
the enactment of a rent control ordinance also is within a
municipality's power to act for the general welfare. *Ingana-
mort v. Fort Lee Bor.,* 62 *N.J.* 521 (1973).

■ The message is clear. State and municipal bodies that
have the power to control land use for the health, safety, and
general welfare of the public may use that power to create
housing opportunities for the poor. It would make no sense at
all to hold that the general welfare encompasses the provision of
low and moderate income housing at the behest of municipali-
ties, but not of state agencies.

We need not dwell on the question whether CAFRA's man-
date that the coastal zone be "dedicated to those kinds of land
uses which promote the public health, safety and welfare,"
*N.J.S.A.* 13:19–2, permits the use of inclusionary requirements
for low and moderate income housing. Just this term, we
acknowledged that, in fulfilling its obligation with respect to
low and moderate income housing, "mandatory set-asides keyed
to the construction of lower income housing, are constitutional
and within the zoning power of a municipality." *Mt. Laurel II,*
*supra,* 92 *N.J.* at 271. The DEP requirement that 20% of the
housing be for low and moderate income residents is just such a
mandatory set-aside.

■ In its decision, the Division explained its reasons for
requiring 20% low and moderate income housing: "[a]n unques-
tioned need exists in the Atlantic City region for housing for low
and moderate income households, as a direct result of casino
development." DEP, Division of Coastal Resources Opinion
# 73 at 21 (August, 1980). Specifically, the Division found:

The Bayshore Centre application is the largest residential or mixed use
development in Atlantic County to receive a CAFRA permit since CAFRA took
effect in 1973. As a significant, region-shaping development, Bayshore Centre

has an opportunity to make an equally significant contribution to meeting the full range of the region's housing needs. The appropriate required percentage of low and moderate income housing for a project the scale of Bayshore Centre (1,530 units) is 10% low income (153 units) and 10% moderate income (153 units) based on the following reasons and precedents. First, 20% low and moderate income housing represents only a small share of the expected households in the county that will need housing assistance in the 1980's. Second, several local governments mandate that planned unit developments provide a required percentage of low and moderate income housing, such as East Windsor (20%) and South Brunswick (15–25%). Third, the New Jersey Supreme Court, in *Oakwood-at-Madison v. Township of Madison,* 72 *N.J.* 481, 512 (1977), required a developer challenging a local exclusionary ordinance to '. . . guarantee the allocation of at least 20% of the units to low and moderate income families.' [*Id.* at 22].

Furthermore, the Division found that approximately 50% of the region's housing needs in the remainder of the 1980's will be for households earning under $15,000. Given its findings, we conclude the conditions imposed by the Division are not arbitrary, capricious or unreasonable and that they are supported by substantial credible evidence. *See Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80 (1980).

CAFRA is but one of three statutes manifesting legislative concern for the development of areas of the state with special environmental characteristics. The other statutes are the Hackensack Meadowlands Reclamation and Development Act, *N.J. S.A.* 13:17–1 to –86, and the Pinelands Protection Act, *N.J.S.A.* 13:18A–1 to –29. In those statutes, which respectively regulate development in the coastal zone, *N.J.S.A.* 13:19–2, the Meadowlands, *N.J.S.A.* 13:17–1, and the Pinelands, *N.J.S.A.* 13:18A–2, the Legislature found that municipal land use control was inadequate to assure orderly and environmentally-sound development. Formerly, the Legislature designated land use regulation as the special province of municipalities. More recently, the Legislature has recognized that everyone, not just a single municipality, has an interest in protecting certain unique, but fragile areas of the State. That change in the legislative scheme heralds a new era in land use control, the significance of which becomes apparent from recognizing that 37.1% of the land

in New Jersey is within the coastal zone, the Meadowlands, and the Pinelands.[1]

With respect to the Meadowlands, the Legislature expressly subordinated municipal zoning power to the master plan of the Hackensack Meadowlands Commission. *N.J.S.A.* 13:17–11(b). That commission has promulgated regulations demonstrating its commitment to "housing that will result in a community with a mix and balance of income levels." *N.J.A.C.* 19:4–5.2(d)(1)(ix).

Similarly, the Legislature established the Pinelands Commission to oversee development of the Pinelands through a management plan and, toward that end, subordinated municipal zoning power to that of the commission. *N.J.S.A.* 13:18A–10(c). In the management plan for the Pinelands, the Commission has required that municipal master plans, to be certified by the Commission, provide that of all available housing units, 10% be set aside for low income, 10% for moderate income, and 5% for

---

[1]Following oral argument, the Attorney General provided us, at our request, with the following information on the acreage of land within the regulatory jurisdiction of the Pinelands Commission, the Hackensack Meadowlands Commission, and DEP under CAFRA:

Acreage Totals and Percentages
for Various Jurisdictions

| Jurisdiction | Acres | Percentage of State |
|---|---|---|
| New Jersey-Land Area | 4,803,200 | 100.0% |
| Pinelands Commission | 933,700 | 19.4% |
| Hackensack Meadowlands Development Commission (HMDC) | 19,730 | 0.4% |
| CAFRA | 880,640 | 18.3% |
| Pinelands Commission, HMDC, & CAFRA | 1,783,470 | 37.1% |

(Because of a 1% overlap of the Pinelands and coastal areas, comprising 50,600 acres, appropriate reductions have been made in the total acreage and percentage figures.)

middle income households. New Jersey Pinelands Comprehensive Management Plan § 6–1202 at 428 (1980). Generally speaking, in municipalities that have not received certification of their master plan, 25% of the dwelling units shall be affordable to low, moderate, and middle income households. *Id.* at § 6–1203. Thus, the legislative and executive branches have recognized that protection of the environment and the provision of low and moderate income housing are not only compatible, but essential. That approach is consistent with our suggestion that "[i]t is desirable that administrative agencies acting under legislative authorization assume the regulation of the housing distribution problem . . . ." *Oakwood at Madison, Inc. v. Township of Madison,* 72 *N.J.* 481, 499 (1977).

In enacting CAFRA, the Legislature harmonized statewide concerns over the coastal zone with concerns of municipalities within that zone. Primarily an environmental statute, CAFRA expressly supplements the municipal zoning authority, *N.J.S.A.* 13:19–19, and provides for residential growth. *N.J.S.A.* 13:19–10 and –16. In further recognition of the shared concerns of DEP and municipalities in the CAFRA zone, the Legislature included in the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –99, effective in 1976, provisions relating to environmental conditions and regional needs. *N.J.S.A.* 40:55D–2, –28, –38.

As a theoretical proposition, the legislative scheme leaves open the possibility for conflicting decisions from DEP and municipal land use agencies in the coastal zone. No such conflict, however, exists in the present case. Here, the applicant received final approval on two of seven phases of the development from the Board of Adjustment of Egg Harbor. Neither that board nor the governing body was a party to or sought to intervene in the present proceeding.

Any problems arising in future applications may be alleviated if, as is the practice of DEP, staff members meet with the applicant and municipal officials to discuss the effect of develop-

ment on the municipality's obligation to meet its fair share of low and moderate income housing. In an appropriate case, DEP might even provide testimony in municipal proceedings on the provision of low and moderate income housing. Presumably, as here, municipal officials may also appear at public hearings conducted by DEP. If problems should develop because of the overlapping jurisdiction of the municipality and DEP, the Legislature can resolve the conflict through amendments to the statutory scheme.

Previously, we have recognized the need for coastal zone municipalities to take cognizance of CAFRA when zoning property within their boundaries. In *Lusardi v. Curtis Point Prop. Owners Ass'n, supra,* the municipalities zoned vacant land along the Atlantic Ocean for residential use. We construed MLUL, *N.J.S.A.* 40:55D–1 to –99, to require municipalities to refrain from exercising their zoning powers in a manner that conflicted with the CAFRA regulations. See *N.J.A.C.* 7:7E–1.1 to –9.23. The obligation "to encourage the most appropriate use of land," *N.J.S.A.* 40:55D–62(a), required the municipality, consistent with CAFRA regulations, to protect public access to ocean beaches. Underlying that decision was the recognition that local planning decisions "must be consistent with statewide policies concerning land use and resource allocation." 86 *N.J.* at 227.

To hold, as Associates contends, that CAFRA can consider only the environment, but not the needs of the people who live in it, is contrary to the legislative intent. Certainly nothing in CAFRA precludes DEP from considering the needs for low and moderate income housing in the coastal zone. We agree with the Appellate Division, which stated:

CAFRA, therefore, clearly vests in DEP the authority to oversee and plan land development, including residential development, in the coastal area. We find it equally clear that CAFRA mandates DEP to utilize, in performing that statutory role, all relevant considerations of an enlightened public policy. The statutory directives to 'promote the public health, safety and welfare' and to advance the 'best long term, social, economic, aesthetic and recreational interest of all people of the State' are not, in our view, reasonably subject to any narrower reading. We find nothing in *Toms River Affiliates v. Environmental*

*Protection Dep't,* 140 *N.J.Super.* 135 (App.Div.1976), certif. den. 71 *N.J.* 345 (1976), or *Public Interest Research Group v. State,* 152 *N.J.Super.* 191 (App.Div. 1977), certif. den. 75 *N.J.* 538 (1977), persuasive of a contrary view. Although Associates urges that those cases limit the authority of the DEP under CAFRA to mere 'environmental concerns,' we find no such holdings there; rather, we read those cases to confirm our own view that the DEP may and must include in its land use planning all relevant criteria, including, as here, the social and economic impact of development. [185 *N.J.Super.* at 517].

Environmental protection, like good zoning, is not an exercise in abstract analysis, but in the pragmatics of responsible and sensitive land use control.

To summarize, we hold that CAFRA delegates to DEP the shared power to regulate development in the coastal zone. Although primarily an environmental act, CAFRA requires that DEP use its power to promote the health, safety, and welfare of the public. In deciding whether to grant permits for large scale residential development, DEP may consider the housing needs of low and moderate income residents. Pursuant to the legislative mandate, DEP has adopted rules directing large scale developers to provide an appropriate amount of affordable housing for low and moderate income units. The requirement that Associates set aside 10% of the residential units for low income housing and 10% for moderate income housing is neither arbitrary nor unreasonable.

### III

We next consider the constitutionality of the delegation by the Legislature to DEP. To be constitutional, the statute must contain adequate standards to guide DEP in exercising the delegated power. In the past, we have construed the requirement for adequate standards to allow "liberal delegation of legislative powers." *Mt. Laurel Tp. v. New Jersey Pub. Advocate,* 83 *N.J.* 522, 532 (1980). Standards may be general, as long as they are sufficiently specific to guide the agency in the exercise of its discretion and to permit judicial review. *Id.*

In this case, we have no doubt that the statute is sufficiently specific to pass constitutional muster. First, the

legislative findings as incorporated into the statute, *N.J.S.A.* 13:19–2, provide ample guidance to DEP. Permits are to be issued consistent with the protection of the environment and the promotion of the health, safety, and welfare of the people of this State. The failure of a proposed facility to further the intent of the act may lead to denial of an application. *N.J.S.A.* 13:19–11. Second, *N.J.S.A.* 13:19–10 lists specific findings that the agency must make in its determination to issue a permit. This combination of statutory language clearly defines the Legislature's mandate while leaving DEP with the power to adopt rules and regulations "to effectuate the purposes of this act." *See N.J. S.A.* 13:19–17; *Toms River Affiliates v. DEP, supra,* 140 *N.J.Super.* at 144–45. Similarly, we find the administrative regulations to be sufficiently specific to be valid.

IV

Finally, we consider whether the requirement that Associates provide low and moderate income housing is an unconstitutional taking contrary to New Jersey Constitution, *N.J. Const.* (1947), Art. 1, par. 20, and the United States Constitution, *U.S. Const.,* Amend. XIV.

In deciding whether use restrictions are confiscatory, we consider whether the regulatory scheme as applied "permit[s] an economically efficient operator to obtain a 'just and reasonable' return on his investment." *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 568 (1975) (upholding rent control ordinance); *see Helmsley v. Fort Lee Bor.,* 78 *N.J.* 200, 210 (1978), *app. dism.,* 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979) (striking down rent control ordinance that imposed 2.5% ceiling on rent increases); *Property Owners Ass'n of North Bergen v. North Bergen Tp.,* 74 *N.J.* 327, 336 (1977) (invalidating rent control ordinance that placed strict limits on rent increases for senior citizens without providing owner with opportunity otherwise to recoup lost rent); *Troy Hills Village v. Tp. Council of Parsippany-Troy Hills Tp.,* 68 *N.J.* 604, 620 (1975) (finding

insufficient owners' proofs that they did not receive a just and reasonable rate of return, and therefore upholding rent control ordinance).

▪▪▪▪▪ The burden of demonstrating that a taking has occurred lies upon the party alleging that the state action is unconstitutional. Proof must be by clear and convincing evidence. *Helmsley v. Fort Lee Bor., supra,* 78 *N.J.* at 218; *see Troy Hills Village, supra,* 68 *N.J.* at 630; *Hutton Park Gardens, supra,* 68 *N.J.* at 570. On the record before us, Associates has not demonstrated that building Bayshore Centre in accordance with the CAFRA conditions will not return a profit or will return a profit so low as to amount to a taking. In fact, Associates waived its opportunity for a plenary hearing under *N.J.A.C.* 7:7D–2.8, which would have provided an appropriate vehicle to develop a record to establish an unconstitutional taking. In the absence of evidence to the contrary, we cannot assume that the regulations will effectuate a deprivation of property without due process of law. At this point, we close with our recent statement: "As for confiscation, the builder who undertakes a project that includes a mandatory set-aside voluntarily assumes the financial burden, if there is any, of that condition." *Mt. Laurel II,* 92 *N.J.* at 267 n. 30.

The judgment of the Appellate Division is affirmed.

SCHREIBER, J., dissenting.

The Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19–1 to –21, is an environmental protection statute administered by the Department of Environmental Protection (DEP). While I understand the allure of finding a grant of "fair-share housing" authority emanating from CAFRA, the statute simply does not contain such a charge. CAFRA does not clothe the DEP with plenary zoning authority. That the majority would prefer to share responsibility or credit with the Legislature, as well as an agency of the executive branch, for this Court's *Mt. Laurel* initiatives is equally understandable. *See ante* at 370.

The statute's text, buttressed by the Legislature's conception of the DEP evidenced in other statutes, precludes such largess.

Certain well-established principles govern this analysis. First, the authority of an administrative agency is limited to those powers expressly granted to it by the Legislature, including those reasonably necessary to effectuate the specific delegation. The grant of authority is to be construed to enable the agency to accomplish its statutory responsibilities. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562 (1978). It is only to that end that courts imply incidental powers necessary to effectuate the legislative intent. Second, actions of an agency beyond its jurisdiction are *ultra vires* and void. *Swede v. City of Clifton,* 22 *N.J.* 303, 312 (1956). Justice Clifford in *In re the Closing of Jamesburg High School,* 83 *N.J.* 540 (1980), quoted approvingly from *Elizabeth Fed. Sav. & Loan Ass'n v. Howell,* 24 *N.J.* 488, 499 (1957), that "an administrative officer is a creature of legislation who must act only within the bounds of the authority delegated to him...." He observed that "[w]here there exists reasonable doubt as to whether such power is vested in the administrative body, the power is denied." 83 *N.J.* at 549. Third, when an important policy question is involved, "[a] court should not find such authority in an agency unless the statute under consideration confers it expressly or by unavoidable implication." *Burlington County Evergreen Park Mental Hosp. v. Cooper,* 56 *N.J.* 579, 598 (1970).

These principles are particularly pertinent in this case. Only one section of the New Jersey Constitution expressly refers to zoning, Art. IV, § 6, par. 2. It provides that "[t]he Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances ... and the exercise of such authority shall be deemed to be within the police power of the State." The Legislature acted shortly after this authority was first vested in it (the zoning amendment was adopted by special election in 1927) by enacting legislation that delegated to municipalities comprehensive control over zoning. The Legislature has only recently codified this legislation, confirming and

extending municipal authority over zoning. Municipal Land Use Law, *N.J.S.A.* 40:55D–1 to –99; *see generally Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel (Mount Laurel II)*, 92 *N.J.* 158, 318–321 (1983).

On occasion the Legislature has superseded municipal zoning authority. With respect to the Hackensack meadowlands the Legislature saw fit to establish the Hackensack Meadowlands Commission to develop the region. Hackensack Meadowlands Reclamation and Development Act, *N.J.S.A.* 13:17–1 to –86. The statute expressly nullified conflicting municipal zoning ordinances. Section 16(b) states that

no action involving a municipal master plan, zoning, ordinance, subdivision, building, or site plan approval, the official map, or the grant or variance or special exception shall be taken by a public body of a constituent municipality, or affected county which shall be inconsistent with the master plan [of the Hackensack Meadowlands Development Commission]. [*N.J.S.A.* 13:17–16(b)]

The pinelands area of the state has been subjected to the developmental control of the Pinelands Commission. Pinelands Protection Act, *N.J.S.A.* 13:18A–1 to –29; *see N.J.S.A.* 13:18A–4. The Legislature requires that county and municipal master plans and local land-use ordinances conform to the Commission's comprehensive management plan and minimum standards contained therein. *N.J.S.A.* 13:18A–12. Control over municipal and county action is detailed. For example, the Commission is authorized to review any final municipal or county approval of any application for development to determine compliance with the Commission's comprehensive management plan and minimum standards contained therein. *N.J.S.A.* 13:18A–15.

CAFRA was enacted in 1973, the Hackensack Meadowlands Act in 1969 and the Pinelands Act in 1979. CAFRA has no similar provisions granting the DEP power to promulgate master plans overriding those of the local zoning authorities. The reason for this omission is manifest when reading CAFRA. CAFRA does not give the DEP plenary zoning authority. Its aim and purpose are to protect portions of the coastal area "suffering serious adverse environmental effects" and to protect

the "natural environmental resource called the coastal area." *N.J.S.A.* 13:19–2. A fair reading of the statute supports only that conclusion.

Respect for municipal zoning is expressly contemplated. Section 19 states that CAFRA's provisions are not to be regarded as "in derogation of any powers now existing and shall be regarded as supplemental and in addition to powers conferred by other laws, including municipal zoning authority." *N.J.S.A.* 13:19–19. The Legislature's concern reflected in CAFRA was the environmental impact of development along the New Jersey shore. This concern obviously transcended municipal boundaries and the Legislature carefully defined the coastal area. *N.J.S.A.* 13:19–4. This Court had previously arrived at a similar conclusion in *Lusardi v. Curtis Point Property Owners Ass'n,* 86 *N.J.* 217 (1981). There Justice Pashman, on reviewing regulations promulgated under CAFRA, observed: "Although these [CAFRA] regulations do not preempt local zoning authority, they embody carefully considered policies for the use of coastal resources that local officials must take into account in zoning shoreline property within their communities." *Id.* at 229. Indeed it is incomprehensible that the Legislature, cognizant of the municipality's plenary zoning power, would not have harmonized or otherwise provided for the situation in which the municipality's actions, under its zoning authority, could conflict with those of the Commissioner.

In *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel (Mt. Laurel I),* 67 *N.J.* 151, appeal dismissed, 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975), this Court laid down the proposition that a municipality could not by its zoning ordinance effectively exclude low and moderate income families from living within its borders. Such an ordinance was contrary to general welfare and therefore had to fall or be amended. One means of rectifying such an exclusionary ordinance was to adopt one that would assure that the municipality provided for sufficient low and middle income housing to meet its fair share

in the region. None of these municipal exclusionary problems motivated the Legislature in enacting CAFRA.

We are concerned with the legislative intent. The majority seeks to discern that intent from the statutory language, relying substantially on the general conclusory reference in the legislative findings, *N.J.S.A.* 13:19–2, that the coastal area "should be dedicated to those kinds of land uses which promote the public health, safety and welfare." When read in context the phrase is simply part of the broad environmental charge of CAFRA. Specifically, note that the majority has quoted this phrase without the "therefore" that both proceeds it and clearly links the phrase to the environmental concerns that permeate the paragraph.[1] Certainly the Legislature was not considering

---

[1]The statutory section reads in full:

*N.J.S.A.* 13:19–2. *Legislative findings*

The Legislature finds and declares that New Jersey's bays, harbors, sounds, wetlands, inlets, the tidal portions of fresh, saline or partially saline streams and tributaries and their adjoining upland fastland drainage area nets, channels, estuaries, barrier beaches, near shore waters and intertidal areas together constitute an exceptional, unique, irreplaceable and delicately balanced physical, chemical and biologically acting and interacting natural environmental resource called the coastal area, that certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing facility activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State; and that, therefore, it is in the interest of the people of the State that all of the coastal area should be dedicated to those kinds of land uses which promote the public health, safety and welfare, protect public and private property, and are reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area.

It is further declared that the coastal area and the State will suffer continuing and ever-accelerating serious adverse economic, social and aesthetic effects unless the State assists, in accordance with the provisions of this act, in the assessment of impacts, stemming from the future location and kinds of facilities within the coastal area, on the delicately balanced environment of that area.

The Legislature further recognizes the legitimate economic aspirations of the inhabitants of the coastal area and wishes to encourage the development of compatible land uses in order to improve the overall

"fair-share housing" in the *Mt. Laurel* sense, particularly since CAFRA antedated *Mt. Laurel I.*

The specific provisions of CAFRA relied on by the majority can hardly provide authority for the implication of "fair-share housing" power. The majority quotes section 10(f) of CAFRA as "illustrat[ing] the nature of [the DEP's] regulatory functions." *Ante* at 364; *N.J.S.A.* 13:19–10(f). However, when read in context, section 10(f) can be seen as just one of a list of environmental criteria that calls to mind more the dangers of nuclear power than the need for low income housing.[2]

---

economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any facilities in the coastal area.

[2]The statutory section reads in full:

*N.J.S.A.* 13:19–10. *Issuance of permit; grounds*

The commissioner shall review filed applications, including the environmental impact statement and all information presented at public hearings. He shall issue a permit only if he finds that the proposed facility:

a. Conforms with all applicable air, water and radiation emission and effluent standards and all applicable water quality criteria and air quality standards.

b. Prevents air emissions and water effluents in excess of the existing dilution, assimilative, and recovery capacities of the air and water environments at the site and within the surrounding region.

c. Provides for the handling and disposal of litter, trash, and refuse in such a manner as to minimize adverse environmental effects and the threat to the public health, safety, and welfare.

d. Would result in minimal feasible impairment of the regenerative capacity of water aquifers or other ground or surface water supplies.

e. Would cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region.

f. Is located or constructed so as to neither endanger human life or property nor otherwise impair the public health, safety, and welfare.

g. Would result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing scenic and aesthetic attributes at the site and within the surrounding region.

The majority makes much of the Legislature's use of the word "residential" in section 16. *Ante* at 365; *N.J.S.A.* 13:19–16. The fact that the agency is to "take into account" the "legitimate need for economic and residential growth" does not provide a basis for the implication of the authority to fix affirmatively a percentage of low income housing. The sentence merely admonishes the Commissioner to recall that environmentalism does not exist in a vacuum. Accordingly, the second use of the term "residential" is carefully couched in environmental terms as well: "The environmental design ... shall include a delineation of various areas appropriate for the development of residential and industrial facilities of various types, *depending on the sensitivity and fragility of the adjacent environment to the existence of such facilities.*" *Id.* (emphasis supplied). Once again, in context the Legislature's intent is evident.[3]

---

[3]The statutory section reads in full:

*N.J.S.A. 13:19–16. Environmental inventory; alternate long-term environmental management strategies; environmental design; presentation to Governor and legislature*

The commissioner shall, within 2 years of the taking effect of this act, prepare an environmental inventory of the environmental resources of the coastal area and of the existing facilities and land use developments within the coastal area and an estimate of the capability of the various area within the coastal area to absorb and react to man-made stresses. The commissioner shall, within 3 years of the taking effect of this act, develop from this environmental inventory alternate long-term environmental management strategies which take into account the paramount need for preserving environmental values and the legitimate need for economic and residential growth within the coastal area. The commissioner shall, within 4 years of the taking effect of this act, select from the alternate environmental management strategies an environmental design for the coastal area. The environmental design shall be the approved environmental management strategy for the coastal area and shall include a delineation of various areas appropriate for the development of residential and industrial facilities of various types, depending on the sensitivity and fragility of the adjacent environment to the existence of such facilities. The environmental inventory, the alternate long-term environmental management strategies and the environmental design for the coastal area shall be presented to the Governor and the Legislature within the time frame indicated herein.

Beyond this less than compelling textual analysis, the majority cites as support opinions of this Court regarding municipal zoning. *Ante* at 366. These cases are more than inapposite: municipalities *have* plenary zoning authority, the DEP does not. If CAFRA stated that the DEP may act as a municipal zoning board in the coastal area, the cited cases would be of help. Since CAFRA contains no such pronouncement, their recitation merely begs the question.

And it is because municipal zoning has been expressly preserved in the coastal area that the granting of fair-share housing authority to CAFRA would be ill-advised. The majority claims that "[i]t would make no sense at all to hold that the general welfare encompasses the provision of low and moderate income housing at the behest of municipalities, but not of state agencies." [4] *Ante* at 367. In fact it would make good sense. If a municipality meets its *Mt. Laurel* obligation, its duty has been satisfied. [5] There is no need to superimpose the DEP's concept of what is needed, particularly since its concept may differ from that of the municipality. The confusion and potential for conflict created by this Court's holding today argues against its reasoning, not for it. The majority admits as much, *ante* at 370, and then offers a solution that belies any statutory basis for its decision: "If problems should develop because of the overlapping jurisdiction of the municipality and DEP, the Legislature can resolve the conflict through amendments to the statutory scheme." *Ante* at 371.

More than unsupportable, the majority's conclusion is affirmatively countermanded by the words of the act. The statute

---

[4] Even if this statement were true, it ignores the fact that the choice of whether the municipality or a state agency or both should determine fair-share housing proportions is a question of judgment to be decided by the Legislature, not the courts.

[5] Appeal from municipal action would be to the specially assigned Superior Court judges. *Mt. Laurel II, supra.*

speaks to those concerns commonly referred to as "environmentalism." For example, section 6 requires an Environmental Impact Statement. *N.J.S.A.* 13:19–6. No such broad and formal analysis is demanded regarding housing availability. Similarly, the Commissioner of Environmental Protection is commanded to make an "environmental inventory." *N.J.S.A.* 13:19–16. From this environmental inventory, the Commissioner is to develop "long-term environmental management strategies." *Id.* Beyond the text of CAFRA, other legislative pronouncements make the "environmental message" of the act most evident.

The Department of Environmental Protection, to which the Legislature has entrusted the administration of CAFRA, is generally charged with "the promotion of environmental protection and the prevention of pollution of the environment of the State." *N.J.S.A.* 13:1D–9. The powers of the DEP, enumerated in 13:1D–9, speak to pollution abatement. Other acts passed by the Legislature for the DEP to administer are also in the ecological vein. *See, e.g.,* Pesticide Control Act of 1971, *N.J.S.A.* 13:1F–1 to –16; Noise Control Act of 1971, *N.J.S.A.* 13:1G–1 to –23. It would indeed be a strained construction of "environmentalism" that would find "fair-share housing" among its concerns. This is not "a constitution we are expounding." *M'Culloch v. Maryland,* 17 *U.S.* (4 *Wheat.*) 316, 407, 4 *L.Ed.* 579, 602 (1819).

When the Legislature has intended to grant plenary zoning power to a state agency, it has done so in unambiguous language. The Pinelands Commission was organized to "insure the realization of pinelands protection through the establishment of a *regional planning and management* commission empowered to prepare and oversee the implementation of a *comprehensive management plan* for the pinelands area." *N.J.S.A.* 13:18A–2 (emphasis added). A similar mandate was not given in CAFRA.

Furthermore, unlike its duties under CAFRA,[6] the DEP was not asked to administer the Pinelands Act. Instead a new authority, not narrowly tailored to the pursuit of environmental goals, was created. The Legislature in creating the Pinelands Commission chose to make it independent of any supervision or control by the DEP. *N.J.S.A.* 13:18A–4. Authority to administer the Pinelands Act was not delegated to the DEP because the Pinelands Act is not solely an environmental statute. Conversely, power to administer CAFRA was appropriately delegated to the DEP by the Legislature because it was exclusively environmental interests that CAFRA was intended to advance. *See also* the Hackensack Meadowlands Act, *N.J.S.A.* 13:17–5, –9, –11, –12, –13, –15, –17, –21.

I am not taking issue with the laudable goals of *Mt. Laurel I* and *II.* I also in no sense intend to deprecate the task that the DEP is charged with by CAFRA. I insist only that the task of environmental superintendence of our "exceptional, unique, irreplaceable and delicately balanced ... natural environmental resource called the coastal area" is the difficult and sole duty conferred by that act. *N.J.S.A.* 13:19–2. The words of CAFRA and the structure of more comprehensive grants of zoning authority make clear that the Legislature so intended. Under CAFRA, the DEP does not have the authority expressly or by implication to impose fair-share housing. To grant the DEP such authority involves an important policy question—to be decided by the Legislature. This Court ought welcome legislative participation in its *Mt. Laurel* initiative only when such participation is intended.

I would modify the conditional permit by eliminating the housing quotas.

---

[6] CAFRA does provide for a Coastal Area Review Board that is "in but not of" the DEP, but it exists solely to hear appeals from the decision of the DEP's Commissioner. *N.J.S.A.* 13:19–13.

*For affirmance* —Chief Justice WILENTZ and Justices CLIF-FORD, HANDLER, POLLOCK and GARIBALDI—5.

*For reversal* —Justice SCHREIBER—1.