242 N.J. Super. 509 (1990)
577 A.2d 840
IN THE MATTER OF CAPE MAY COUNTY MUNICIPAL UTILITIES AUTHORITY.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 1990.
Decided July 11, 1990.
*510 Before Judges DREIER, SCALERA and D'ANNUNZIO.
Richard M. Hluchan argued the cause for appellant Stone Harbor Boulevard Corporation (Drinker, Biddle & Reath, attorneys).
Harley A. Williams, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Robert J. Del Tufo, Attorney General).
Joseph J. Slachetka argued the cause for respondent Cape May County Municipal Utilities Authority (Higgins, Slachetka & Long, attorneys).
*511 Bruce M. Gorman argued the cause for respondent Township of Middle.
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Pursuant to the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 et seq., the Cape May County Municipal Utilities Authority (the Authority) received a Department of Environmental Protection (DEP) permit to construct two pumping stations and a force main "to transmit sanitary wastewater from Stone Harbor Manor and Stone Harbor Boulevard to the Seven Mile Beach/Middle Regional Wastewater Treatment Plant." The project's purpose was to provide sewers and treatment facilities to existing development serviced by malfunctioning individual disposal systems. A March 1980[1] report commissioned by the Authority estimated that the Stone Harbor Manor and Boulevard areas had 170 individual disposal systems all of which were malfunctioning. The malfunctioning systems contributed to environmental degradation of an environmentally sensitive area.[2]
CAFRA prohibits construction of "a facility in the coastal area" without a CAFRA permit, N.J.S.A. 13:19-5. Only a "facility" as defined in N.J.S.A. 13:19-3 is subject to CAFRA. Waste treatment plants and pipelines designed to transport sanitary sewage are CAFRA facilities. N.J.S.A. 13:19-3c(5) and (12). The project in question is within CAFRA's "coastal area." N.J.S.A. 13:19-4.
*512 An application for a CAFRA permit must include an environmental impact statement. N.J.S.A. 13:19-6 and 7. N.J.S.A. 13:19-10 (§ 10) specifies the findings which the DEP must make before a permit can issue. However, N.J.S.A. 13:19-11 (§ 11) provides:
Notwithstanding the applicant's compliance with the criteria listed in section 10 of this act, if the commissioner finds that the proposed facility would violate or tend to violate the purpose and intent of this act as specified in section 2, or if the commissioner finds that the proposed facility would materially contribute to an already serious and unacceptable level of environmental degradation or resource exhaustion, he may deny the permit application, or he may issue a permit subject to such conditions as he finds reasonably necessary to promote the public health, safety and welfare, to protect public and private property, wildlife and marine fisheries, and to preserve, protect and enhance the natural environment. [Footnotes omitted.]
Thus, the Legislature has granted DEP substantial authority to regulate development in the coastal area including the authority to grant a permit subject to conditions found to be "reasonably necessary to promote the public health, safety and welfare ... and to preserve, protect and enhance the natural environment." See Matter of Egg Harbor Associates, 94 N.J. 358, 364, 464 A.2d 1115 (1983) ("the delegated powers require DEP to regulate land use within the coastal zone for the general welfare").[3]
The Authority's CAFRA permit contained five administrative and five physical conditions. This appeal concerns physical condition one (the condition). As originally imposed the condition provided:
No connections (sewer hook ups) may be made to the force main or pump stations, or to a collection system tying into the force main or pump stations, to service new development or redevelopment, including the addition of residential units, which is not in compliance with applicable Rules on Coastal Resources and Development. Applicable policies include but are not limited to Island Corridor, Wetlands, Wetlands Buffers, Endangered or Threatened Species Habitat. The CMCMUA is responsible for enforcing this condition, either individually or through an agreement with Middle Township when a collection system is constructed. The CMCMUA must pass a resolution prior to construction agreeing to enforce this restriction of hook ups.
*513 Facially, the condition required all new development, including development which would not constitute a "facility" subject to CAFRA, to comply with the full panoply of CAFRA requirements as a prerequisite to connection with the sewer line. DEP imposed the condition because of its concern that the sewer line would attract and "promote new and/or expanded development along the bay island corridor." DEP Summary Report, August, 1988, p. 2; see N.J.A.C. 7:7E-3.24 for the definition of "bay island corridor" and the severe development restrictions applicable to it.
The Authority and Stone Harbor Boulevard Corporation (SHBC) appealed from imposition of the condition to the Coastal Area Review Board (CARB). N.J.S.A. 13:19-13. The CARB substantially modified the condition by requiring only a DEP determination that a proposed development or redevelopment will not create "adverse secondary impacts" before the Authority accepts its additional sewage flow. As a result of CARB's action the condition now reads:
CMCMUA shall not accept any additional flow to service new development or redevelopment, including the addition of residential units, until it has received from Division of Coastal Resources a determination that the proposed development or redevelopment will not create adverse secondary impacts. This condition shall not apply to additions to or alterations of single or two-family dwelling units that do not increase the number of dwelling units or dwelling unit equivalents.
Division of Coastal Resources shall receive a conceptual plan from any applicant proposing to connect a new development or redevelopment into the facility. Within five days of receipt of the plan, Division of Coastal Resources shall hold a preapplication conference with the applicant to determine the nature and level of information necessary to determine whether adverse secondary impacts as defined in N.J.A.C. 7:7E-6.3(a) would result from the proposal. Within ten days after the prehearing conference, the Division shall send to the applicant a letter specifying the nature and level of documentation to be submitted by the applicant. Within ninety days after receiving all of the submittals specified, the Division shall issue a determination of whether or not the proposal will result in any unacceptable secondary impacts. Any unacceptable secondary impacts as well as the rationale for any conditions imposed on the determination of no adverse secondary impacts shall be clearly set forth in the determination. Failure of the Division to respond within ninety days from receipt of a complete submittal by the applicant shall be deemed equivalent to a finding of no adverse secondary impacts.
*514 SHBC appeals from CARB's amended condition. It owns a developed lot on Stone Harbor Boulevard accessible to the proposed sewer line. The lot was a lumberyard site, but currently it is used as a storage area for a construction business. Approximately 76% of the 1.93-acre lot is in buildings or other impervious cover. SHBC professes that it intends to build a 24-unit hotel on the site, a permitted use under the local zoning ordinance. A 24-unit hotel is not a "facility" subject to CAFRA.[4] Consequently, appellant contends that the condition is beyond DEP's authority because it is an attempt to regulate indirectly "that which it has no legal authority to regulate directly."
The condition applies to projects not otherwise subject to CAFRA. Indeed, since any project involving a CAFRA "facility" is already subject to CAFRA, it can be argued that the condition's primary purpose was to reach non-CAFRA projects. Though we are mindful of the need to scrutinize any attempt by DEP to exceed its statutory authority, see Last Chance Development Partnership v. Kean, 119 N.J. 425, 575 A.2d 427 (1990), affirming 232 N.J. Super. 115, 556 A.2d 796 (App.Div. 1989) (Waterfront Development Act does not authorize DEP regulation of upland tracts in the coastal area), we conclude that the condition, as modified by CARB, was within DEP's power.
CAFRA grants broad authority to the DEP to protect the environment and to regulate land use within the coastal area for the general welfare. Matter of Egg Harbor Associates, supra; cf. Crema v. New Jersey Dept. of Environmental Protection, 94 N.J. 286, 463 A.2d 910 (1983) (DEP had implied authority under CAFRA to engage in conceptual review and approval but was required to exercise that authority through *515 rule making). The statute requires certain findings by DEP before a CAFRA permit issues. Nevertheless, DEP has residual authority to deny the permit despite § 10 findings if "the proposed facility would violate or tend to violate the purpose and intent of this act as specified in [N.J.S.A. 13:19-2], or if the [DEP] finds that the proposed facility would materially contribute to an already serious and unacceptable level of environmental degradation or resource exhaustion...." N.J.S.A. 13:19-11. Alternatively, § 11 authorizes a CAFRA permit subject to conditions "reasonably necessary to promote the public ... welfare ... and to preserve, protect and enhance the natural environment." Ibid.
DEP recognized that the Authority's application presented a dilemma. The sewer line was consistent with CAFRA's purpose because it would substitute for many malfunctioning individual sewage disposal systems, thereby eliminating a source of serious water pollution. On the other hand, DEP recognized that sewer lines attract additional development. The capacity of particular projects to generate additional development is recognized in a DEP CAFRA regulation titled Secondary Impacts. N.J.A.C. 7:7E-6.3. A copy of the regulation is attached as an appendix to this opinion. It provides in part that "[c]oastal development that induces further development shall demonstrate, to the maximum extent practicable, that the secondary impacts of the development will satisfy the Coastal Resource and Development Policies." The regulation specifically identifies a wastewater treatment system as a type of development requiring a secondary impact analysis because of its capacity to generate additional development.
New development connecting to a sewer line is a secondary impact of that sewer line. Instead of utilizing secondary impact analysis to obstruct the Authority's project, DEP, through the CARB condition, subjects new connections to carefully circumscribed scrutiny consisting of a "determination that the proposed development or redevelopment will not create adverse secondary impacts." [Emphasis supplied.]
*516 The condition does not subject new connections to the full CAFRA scrutiny as did DEP's original condition and, therefore, does not nullify the Legislature's decision to exclude certain types of projects from CAFRA's reach. See Last Chance Development v. Kean, supra. The condition's impact is also limited by the definition of secondary impacts.
"Secondary impacts" are the effects of additional development likely to be constructed as a result of the approval of a particular proposal. Secondary impacts can also include traffic increases, increased recreational demand and any other offsite impacts generated by onsite activities which affect the surrounding region. [N.J.A.C. 7:7E-6.3(a).]
The secondary impact definition contains two elements. The first element is the effect of "additional development likely to be construed as a result of the approval" of appellant's proposed 24-unit hotel. The second element includes an evaluation of "traffic increases, increased recreational demand and any other offsite impacts generated by onsite activities [appellant's hotel] which affect the surrounding region."[5]
We are persuaded that the condition represents a limited and reasonable accommodation of the competing policy considerations confronting the DEP when it acted on the Authority's application and was authorized by § 11's grant of authority to impose conditions reasonably necessary to "promote the public health, safety and welfare ... and to preserve, protect and enhance the natural environment." N.J.S.A. 13:19-11. See State, Dept. of Envir. Protection v. Stavola, 103 N.J. 425, 433-434, 511 A.2d 622 (1986) (CAFRA to be liberally construed and DEP had "implicit statutory authority to promulgate rules and regulations that interpret a seaside beach club cabana as `equivalent' to `a housing development of 25 or more dwelling units.'"); Matter of Egg Harbor Associates, supra; Crema v. *517 New Jersey Dept. of Environmental Protection, supra. We thus conclude that the condition, as we have analyzed it, is facially valid. Whether DEP's application of the condition effects an impermissible exercise of DEP's authority must be determined on a case by case basis.
SHBC also contends that the condition is invalid because it allegedly conflicts with a sewage facility plan and a water quality management plan approved and funded under the authority of Federal and State statutes.[6] Pursuant to these approved plans SHBC's property was designated as sewerable. This contention is without merit because the condition on its face does not conflict with the prior approvals. The condition does not apply to existing development in the sewered area. The primary purpose of the project is to service existing development. The condition does not interfere with or affect that purpose. The condition applies only to "additional flow to service new development or redevelopment, including the addition of residential units ...." and, as previously indicated, subjects the new development only to a secondary impact analysis.
Affirmed.[7]

APPENDIX

7:7E-6.3 Secondary impacts
(a) "Secondary impacts" are the effects of additional development likely to be constructed as a result of the approval of a *518 particular proposal. Secondary impacts can also include traffic increases, increased recreational demand and any other offsite impacts generated by onsite activities which affect the surrounding region.
(b) Coastal development that induces further development shall demonstrate, to the maximum extent practicable, that the secondary impacts of the development will satisfy the Coastal Resource and Development Policies. The level of detail and areas of emphasis of the secondary impact analysis are expected to vary depending upon the type of development. Minor projects may not even require such an analysis. Transportation and wastewater treatment systems are the principal types of development that require a secondary impact analysis, but major industrial, energy, commercial, residential, and other projects may also require a rigorous secondary impact analysis.
1. Secondary impact analysis must include an analysis of the likely geographic extent of induced development, its relationship to the State Development Guide Plan Concept Map, an assessment of likely induced point and non-point air and water quality impacts, and an evaluation of the induced development in terms of all applicable Coastal Resource and Development Policies.
2. Models for secondary impact analysis may be found in New Jersey Department of Community Affairs, Division of State and Regional Planning, Secondary Impacts of Regional Sewerage Systems (1975), and in USEPA, Manual for Evaluating Secondary Impacts of Wastewater Treatment Facilities (EPA-600/5-78-003, 1978).
(c) Rationale: This statement can be reviewed at the Office of Administrative Law, Publications and Filings, Quakerbridge Plaza, Bldg. 9, CN 301, Trenton, New Jersey 08625.
Amended by R. 1985 d.715, effective February 3, 1986.
See: 17 N.J.R. 1466(a), 17 N.J.R. 1797(b), 17 N.J.R. 1797(c), 18 N.J.R. 314(a). Added text to (a) "Secondary impacts can ... and surrounding region."
NOTES
[1] Selected Plan Report, Seven Mile Beach/Middle Region, March 1980.
[2] "All of the 120 septic systems currently operating along the boulevard are ... discharging inadequately treated wastewater into the adjacent wetlands. Shellfishing has been condemned ... due to fecal coliform levels exceeding State water quality standards. Public sewer service is expected to result in a marked improvement in local water quality." [Stone Harbor Boulevard Pump Station And Force Main Environmental Impact Statement, May 1988, p.i.]
[3] The Supreme Court held that DEP's CAFRA authority included the power to compel a developer to provide affordable housing. In 1986, the Legislature amended CAFRA to eliminate that power. L. 1986, c. 145; N.J.S.A. 13:19-11.1.
[4] Projects creating less than 25 additional dwelling units are not subject to CAFRA. N.J.S.A. 13:19-3c(5). DEP regulations interpreting "facility" include within that term "the construction of 25 or more motel or hotel rooms." N.J.A.C. 7:7-2.1(b)4v.
[5] Whether the second element relates to traffic increase generated by appellant's proposed hotel or merely to traffic generated by the additional development generated by appellant's hotel is unclear. We have assumed an interpretation most supportive of appellant's contentions on this appeal.
[6] 33 U.S.C.A. § 1281; 33 U.S.C.A. § 1288; N.J.S.A. 58:11A-1 et seq. are cited by SHBC.
[7] The Township of Middle filed a "Statement in Lieu of Formal Brief." In it the township supported SHBC's position. In addition the township contended that the condition which SHBC has challenged as well as administrative conditions # 2 and # 5 unlawfully usurp the township's zoning power. Administrative condition # 2 provides that no areas outside the current sewerable area as defined in the approval plans (see text at footnote 6) may connect with the sewer line until DEP approval. Administrative condition # 5 was deleted by CARB. Although we have grave doubts about the merit of the township's contention regarding condition # 2, we do not address the contention because we have found no record of any notice of appeal filed on the township's behalf.