820 A.2d 88 (2003)
359 N.J. Super. 391
ISLAND VENTURE ASSOCIATES, Petitioner-Appellant,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 2003.
Decided April 11, 2003.
Richard M. Hluchan, Voorhees, argued the cause for appellant (Ballard Spahr Andrews & Ingersoll, attorneys; Mr. Hluchan, of counsel and with Jeffrey S. Beenstock, on the brief).
Jose L. Fernandez, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Michael J. Haas, of counsel; Mr. Fernandez, on the brief).
Paul H. Schneider, Middletown, argued the cause for amicus curiae New Jersey Builders Association (Giordano, Halleran & Ciesla, attorneys; Michael J. Gross, of counsel; Steven M. Dalton and Mr. Schneider, on the brief).
Before Judges WALLACE, JR., CIANCIA and AXELRAD.
The opinion of the court was delivered by CIANCIA, J.A.D.
This appeal presents the question of whether a bona fide purchaser of unimproved property will be held to a land use restriction imposed on a predecessor-in-title by a state agency even though that restriction could not be found by a diligent search of record title. The court last addressed this troublesome issue in Aldrich v. Schwartz, 258 N.J.Super. 300, 609 A.2d 507 (App.Div.1992), where we held that a variance condition undiscoverable by a diligent search of title was binding on an innocent purchaser of property. We expressed our rationale as follows:
The balance of competing concerns is not an easy one to strike. Any resolution creates a real risk of unfairness, either to innocent buyers or to the protected public. We approach the problem not as one involving title searches and what they can reasonably reveal, but as one implicating the strong public interest in the enforceability of variance conditions, in the neighborhoods they protect, and in the expectations that have reasonably grown up around them. Our holding that plaintiff is bound by the 1969 restriction is dictated by land planning considerations, and by the danger that a decision devitalizing longstanding variance conditions may prejudice existing development and the zoning *89 plan of some towns and neighborhoods.

[Id. at 310, 609 A.2d 507.]
We have no disagreement with the rationale or result in Aldrich. On the facts there presented the balance was properly struck. As discussed more fully below, however, the present case reflects competing public interests which, on the facts here presented, we believe should be resolved in favor of the integrity of our property recording system.
In light of the nature of our resolution, only an abbreviated factual presentation is necessary. We are assisted in that regard by a thorough and detailed opinion issued by Chief Administrative Law Judge Jeff S. Masin, whose decision was adopted by the Department of Environmental Protection (DEP).
In 1994 appellant, Island Venture Associates, purchased two unimproved lots on Long Beach Island in the Township of Long Beach designated as lots 3.03 and 3.04, block 25.12. The intent was to build residential dwellings on the parcels. It is undisputed that prior to closing Island Venture performed a diligent title search that revealed no restrictions antithetical to residential construction on these two upland lots. The deed to Island Venture also contained no such restrictions. In actuality, however, the parcels were subject to a restriction previously imposed by the DEP pursuant to the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1, et seq. The restriction limited the lots to "water-dependent" uses.
The restriction arose in 1988 when Island Venture's predecessor-in-interest, High Bar Harbor Development Company (High Bar), sought to develop a significantly larger parcel in the township. The development proposal included a marina site that, in turn, contained several lots including property later to be designated as lots 3.03 and 3.04. High Bar was ultimately granted permission by the DEP to use a portion of the land to construct eighteen single-family homes on condition that the adjacent marina site be limited to water-dependent uses. One of the lots within that restricted marina site was designated as lot 3. At some later time lot 3 came to be designated as lot 3.02, although the record does not reflect the exact mechanism for that change in nomenclature. In turn, lot 3.02 was subdivided and part of it became lots 3.03 and 3.04, the parcels ultimately purchased by Island Venture.
Initially, Island Venture disputed that the land now designated as lots 3.03 and 3.04 was ever intended by the DEP to be within the marina site, but there is substantial credible evidence in the record to the contrary. ALJ Masin's opinion details the basis for such a finding and the opinion of the DEP Commissioner proceeds on that assumption. We find no reason to question the finding that the property that became designated as lots 3.03 and 3.04 was within the restricted "marina site" as referenced in the CAFRA permit.
A January 1989 CAFRA permit to High Bar required a deed restriction to limit the use of the marina site. High Bar drafted the necessary deed restriction language and the DEP approved it. High Bar recorded a master deed stating that the marina site, referred to therein as the "Condominium Property,"[1] shall "remain a water-dependent use in perpetuity." The master deed, however, failed to properly identify the restricted property. In ALJ Masin's words:

*90 The metes and bounds description and the survey attached to the Master Deed as Exhibits thereto do indicate that the Condominium Property did not include Lots 3.03 and 3.04. The southern boundary of the Condominium Property is shown as the northern boundary of Lot 3.03. Thus, examination of the Master Deed, survey and metes and bounds description would not alert one to the possibility that Lots 3.03, or 3.04 for that matter, might be included in the deed restriction stated in the Master Deed, which by its terms applies only to the "Condominium Property." ... [I]t is recognized that a reasonable examination of the Master Deed and survey and metes and bounds would not identify to an examiner or a prospective purchaser that the Master Deed, while properly reciting the limitation placed upon the "Condominium Property," failed to properly indicate the totality of the area encompassed within that restriction. Thus, the Master Deed and its accompanying exhibits misled such persons about what area actually constituted the "Condominium Property," a term that should properly have been understood by all, including the DEP personnel who reviewed the language, to include all of the area formerly encompassed by Lots 3 and 3.01.
Before taking title to lots 3.03 and 3.04, Island Venture received a title search report that did not reveal any recorded restrictions on the two lots. ALJ Masin found, and it is undisputed on the record, that Island Venture reasonably understood from its good-faith search that it could build on these lots "without any DEP-imposed, CAFRA-related restriction."
If the DEP/CAFRA restriction ran with the land, Island Venture was arguably subject to it on the rationale expressed in Aldrich that the public policy of CAFRA, i.e., the preservation of our coastal area environment, must prevail over the private interests of an innocent land purchaser. We have no disagreement with the predicate determination that DEP/CAFRA land use limitations may be imposed by deed restrictions. In re Protest of Coastal Permit, 354 N.J.Super. 293, 367-368, 807 A.2d 198 (App.Div.2002). The DEP Commissioner has the authority to issue permits subject to conditions "reasonably necessary to promote the public health, safety and welfare, to protect public and private property, wildlife and marine fisheries, and to preserve, protect and enhance the natural environment." N.J.S.A. 13:19-11. CAFRA provides in relevant part:
In the event of rental, lease, sale or other conveyances by an applicant to whom a permit is issued, such permit, with any conditions, shall be continued in force and shall apply to the new tenant, lessee, owner, or assignee so long as there is no change in the nature of the development set forth in the original application.

[N.J.S.A. 13:19-14.]
Certainly, the condition imposed as the quid pro quo for a permit must be honored by succeeding owners of the property.
This brings us to the legal question of whether the proper balance of conflicting policy considerations and equities should result in application of the CAFRA restriction to purchasers who were unable to discover the land use limitation through a diligent search of title. Although we are mindful of the deference we owe administrative agencies when they construe the statutes they are charged with implementing, we are not bound by the agency's interpretation of a statute or its determination of a strictly legal issue. Mayflower Sec. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973); Ciminera v. Bd. of Review, *91 319 N.J.Super. 217, 223, 725 A.2d 73 (App.Div.1999).
In Aldrich, a three-lot subdivision was approved by the municipality and a variance granted to permit a preexisting easement to be narrowed from twenty feet to fifteen feet. The variance was granted subject to conditions, one of which was a building prohibition on the southerly forty-five feet of a new ocean-front lot. The variance and conditions were not recorded. Aldrich eventually bought the lot only to subsequently learn that a portion of the land could not be built upon. In evaluating the legitimate rights and concerns of both sides we noted that, although variances ran with the land, there was no organized way to research municipal board resolutions for conditional variances and no statute requiring recordation. We were further concerned that over the years throughout the State innumerable variances had been imposed with conditions, all of which would be at risk if a subsequent purchaser of affected property were relieved of the condition by virtue of it being undiscoverable as part of a diligent title search. The strong public interest in the enforcement of variance conditions prevailed.
We view the present facts somewhat differently. The public interest in the proper development of our coastal area can hardly be disputed. See In re Egg Harbor Assocs., 94 N.J. 358, 364, 464 A.2d 1115 (1983). We do not, however, believe that that interest can only be upheld by sacrificing the equally strong public interest in our public recording statutes.
Our case law is replete with concerns for the "integrity of record title and the stability of the recording system." Sonderman v. Remington Const. Co., 127 N.J. 96, 112, 603 A.2d 1 (1992); accord Cox v. RKA Corp., 164 N.J. 487, 497, 753 A.2d 1112 (2000); Lincoln Fed. Sav. & Loan Ass'n v. Platt Homes, Inc., 185 N.J.Super. 457, 466, 449 A.2d 553 (Ch.Div.1982). In the seminal case of Palamarg Realty Co. v. Rehac, 80 N.J. 446, 404 A.2d 21 (1979), the Court resolved a quiet title action between private entities. Writing for the Court, Justice Mountain said:
Generally speaking, and absent any unusual equity, a court should decide a question of title such as this in the way that will best support and maintain the integrity of the recording system. The underlying purpose of the Recording Act is clear.
An historical study of the [Recording] Act, as well as an analysis of the cases interpreting it, leads to the conclusion that it was designed to compel the recording of instruments affecting title, for the ultimate purpose of permitting purchasers to rely upon the record title and to purchase and hold title to lands within this state with confidence. The means by which the compulsion to record is accomplished is by favoring a recording purchaser, both by empowering him to divest a former non-recording title owner and by preventing a subsequent purchaser from divesting him of title. This ability to deprive a prior and bona fide purchaser for value of his property shows a genuine favoritism toward a recording purchaser. It is a clear mandate that the recording purchaser be given every consideration permitted by the law, including all favorable presumptions of law and fact. It is likewise a clear expression that a purchaser be able to rely upon the record title. [Jones, The New Jersey Recording ActA Study of its Policy, 12 Rutgers L.Rev. 328, 329-30 (1957)].
This policy is clearly established in the New Jersey Recording Act, pertinent parts of which provide as follows:

*92 Except as otherwise provided herein, whenever any deed ... shall have been or shall be duly recorded ... such record shall, from that time, be notice to all subsequent ... purchasers... of the execution of the deed... so recorded and of the contents thereof. [N.J.S.A. 46:21-1]
Every deed ... shall, until duly recorded..., be void and of no effect against ... all subsequent bona fide purchasers ... for valuable consideration, not having notice thereof, whose deed shall have been first duly recorded.... [N.J.S.A. 46:22-1]

[Id. at 453-454, 404 A.2d 21.]
This court has also expressed similar views, See, e.g., Mezey v. United Jersey Bank, 254 N.J.Super. 19, 26, 603 A.2d 49 (App.Div.1992). In Brescher v. Gern, Dunetz, Davison & Weinstein, P.C., 245 N.J.Super. 365, 585 A.2d 961 (App.Div.1991), we said that a county court judgment does not create a statewide lien on property until it is entered in the civil judgment and order docket maintained by the Clerk of the Superior Court. Once again, we were concerned that there be "no improper impairment of titles." Id. at 371, 585 A.2d 961.
The policy of the Recording Act is to provide a reasonable limit on the obligation of a purchaser to search the record. Palamarg Realty Co. v. Rehac, 80 N.J. 446, 456, 404 A.2d 21 (1979); Security Pacific Finance Corporation v. Taylor, 193 N.J.Super. 434, 442, 474 A.2d 1096 (Ch.Div.1984). The very purpose of the Act is to protect those who have made a "reasonable search of the record title." 193 N.J.Super. at 442, 474 A.2d 1096. A bona fide purchaser is chargeable only with what appears in the record. Ibid.

[Id. at 371-372, 585 A.2d 961.]
Certainly, the competing equities here are not between the public interest of the CAFRA statute and the more parochial interests of a private land purchaser. Rather, in our view, the tension is between two very significant public policies as contained in CAFRA and in our public recording statutes. If exceptions continue to be made to our race-notice system of public recordation, it will not be long before that system loses its utility. Nor is such a result necessary to preserve the public policy expressed in CAFRA.
Here, unlike in Aldrich, we are not dealing with the potential for innumerable restrictions established by hundreds of municipalities. We are dealing with a state agency charged with the enforcement of a statute that addresses specifically defined geography. See N.J.S.A. 13:19-4. As far as the present record reveals, the DEP has made efforts to assure the recording of deed restrictions that are required by the CAFRA permitting process. The breakdown here was that the master deed incorrectly stated the area restricted, and DEP either made no independent investigation to assure that the master deed accurately reflected the area of restriction or, at best, it failed in that endeavor. Had the master deed properly set out the restriction on the land that later was denominated as lots 3.03 and 3.04, a diligent search of title would have discovered the restriction and Island Venture would have been bound thereby. At oral argument we were informed by the Attorney General that additional steps have since been taken to assure proper recordation of CAFRA deed restrictions.[2] *93 Thus, we need not extend Aldrich to the present facts in order to reach an equitable accommodation of the competing legitimate interests. CAFRA and the public recording statutes can co-exist without detriment to either's public policy interests. In this case though, the integrity and reliability of our recording statutes require that Island Venture receive the benefit of its due diligence. Lots 3.03 and 3.04 shall not be restricted to water-dependent uses by virtue of the restrictions placed on Island Venture's predecessor-in-title.
The final decision of the DEP is reversed.
NOTES
[1] This term is misleading to the extent it implies traditional condominium use. The marina operates as a "dockominium."
[2] Those additional steps were not specified, but we note that N.J.A.C. 7:7-1.5 currently provides in part:

15. If required by the Department as a permit condition, the permit shall be filed with the clerk of the county court in which the project site is located as notice to prospective purchasers.
....
18. If the Department determines that a conservation restriction, as defined at N.J.A.C. 7:7-1.3, is necessary to protect the public health, safety, and welfare, or to protect wildlife and/or fisheries, or to otherwise preserve, protect, and enhance the natural environment, the permittee shall, prior to site preparation, submit to the Department proof that such a conservation restriction has been recorded in the office of the clerk of the county or the registrar of deeds and mortgages of the county in which the development site is located. The conservation restriction shall be in the form and terms appropriate to the property as specified and approved by the Department, and shall run with the property and be binding upon the property owner and the successors in interest in the property or in any part thereof;....