846 A.2d 1228

ISLAND VENTURE ASSOCIATES, PETITIONER–RESPONDENT,
v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION, RESPONDENT–APPELLANT.

Argued February 2, 2004—Decided May 5, 2004.

*Rachel J. Horowitz,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel).

*Richard M. Hluchan,* argued the cause for respondent (*Ballard Spahr Andrews & Ingersoll,* attorneys).

*Thomas A. Borden,* argued the cause for *amici curiae* Pinelands Preservation Alliance and Association of New Jersey Environmental Commissions.

*Paul H. Schneider,* argued the cause for *amici curiae* New Jersey Builders Association (*Giordano, Halleran & Ciesla,* attorneys; *Michael J. Gross,* of counsel).

Justice VERNIERO delivered the opinion of the Court.

We must decide whether the property owner in this case is bound to a restriction on its land that was imposed by the Department of Environmental Protection (DEP) as part of a coastal permit issued to the owner's predecessor in title. Because the restriction could not be found by a diligent search of record title, and for the other reasons expressed below, we hold that the property owner is not bound by the restriction.

I.

We derive our summary of facts largely from the record established before the administrative law judge (ALJ), whose decision the DEP ultimately adopted. In 1988, High Bar Harbor Development Company (High Bar) sought a permit from the DEP to construct eighteen single-family dwellings on a tract of land in Long Beach Township (the Township). Issued pursuant to the

Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19–1 to –21, the permit identifies the location of the "Activity/Facility" as "Block Y–12 Lot 3, 3.01, 4.01, 4.02, 4.08[,] 4.09 & 16." In addition to the eighteen-lot residential subdivision, the proposed development also included an adjacent marina site, which resulted in the DEP imposing an administrative condition to the CAFRA permit.

The condition required that High Bar, "[p]rior to construction, submit to [the DEP's Division of Coastal Resources] for review and approval language for a deed restriction for the adjacent marina site, restricting this property to remain a water dependent use in perpetuity." That language was to be included in a so-called "Dockominium–Condominium Master Deed." In response, High Bar recorded the required form of deed with the Ocean County Clerk's Office in 1990. Section 10(a) of the deed contains this sentence: "The Condominium Property shall remain a water-dependent use in perpetuity." The DEP approved that language in 1989, prior to its inclusion in the recorded instrument.

After High Bar had obtained the CAFRA permit, it submitted a minor subdivision application to the appropriate local zoning agency, seeking approval to subdivide Block "25.12 (formerly Y–12) Lots 3.01 and 3.02." (Apparently, Lot 3.02 was designated as that number after previously being known as Lot 3.) The subdivision was approved, establishing several lots, including Lots 3.03 and 3.04, which are the subject of this dispute.

Sometime in 1991, High Bar inquired of the DEP whether construction on the newly subdivided parcels, Lots 3.03 and 3.04, required a CAFRA permit. Along with that inquiry, High Bar also submitted for the DEP's review the minor subdivision site plan. High Bar received a response by letter dated March 18, 1991, from the DEP's Division of Coastal Resources. The letter states, in part: "No coastal permits required, provided no construction to take place in wetlands." The letter makes no reference to the 1989 water-dependent restriction.

High Bar did not proceed with the proposed development of Lots 3.03 and 3.04. Instead, Island Venture Associates (Island

Venture) purchased the two lots at an auction in 1994. Prior to the closing of title, Island Venture ordered a title insurance policy that revealed the water-dependent restriction contained in the recorded Master Deed. The policy, however, did not identify any restriction affecting Lots 3.03 or 3.04. Nor did the deed from the seller to Island·Venture contain any condition concerning water-dependency. The ALJ described at length Island Venture's predicament:

> [I]t is recognized that a reasonable examination of the Master Deed and survey and metes and bounds would not identify to an examiner or a prospective purchaser that the Master Deed, while properly reciting the limitation placed upon the "Condominium Property," failed to properly indicate the totality of the area encompassed within that restriction. Thus, the Master Deed and its accompanying exhibits misled such persons about what area actually constituted the "Condominium Property," a term that should properly have been understood by all, including the DEP personnel who reviewed the language, to include all of the area formerly encompassed by Lots 3 and 3.01.
>
> Island Venture took title to Lots 3.03 and 3.04 after receiving a title insurance report that did not reveal any recorded restrictions on the use of the two lots. It did reveal a restriction on the adjacent Condominium Property, understood as not in any manner imposing any such restriction on the two lots Island Venture intended to purchase. Thus, Island Venture reasonably understood from its reasonable search that it could build on these lots without any DEP-imposed, CAFRA-related restriction. Island Venture was thus a "bona fide purchaser for value, without actual notice of the condition." Further, it can be said that it did not have any constructive notice, as the references in the Master Deed to the "Condominium Property" bearing the water-dependent restriction did not in any reasonable manner alert a prospective purchaser that that term actually encompassed Lots 3.03 and 3.04. It would not have been reasonable to expect that a title searcher would have been alerted to the need to go to the DEP records to further establish the meaning of the term "Condominium Property," especially given the metes and bounds and survey data attached to the Master Deed. *Thus, Island Venture can reasonably and with justification contend that it was a good faith, innocent purchaser that did what it was expected to, conducting a reasonable search and lulled into the reasonable belief and understanding that the property it purchased was free of any DEP restriction on the use of the lots.*
>
> [(Emphasis added.)]

In 1999, Island Venture applied to the Township for construction permits to build two family residences, one on Lot 3.03 and another on Lot 3.04. The Township in turn asked the DEP whether the 1989 CAFRA permit would allow for the proposed construction. Initially, the DEP believed that the two lots were

part of the non-marina, residential area contained within High Bar's original eighteen-lot proposal. Consistent with that belief, the agency suggested that Island Venture apply for a modification of the 1989 CAFRA permit to allow for the construction of two additional dwellings.

The DEP then reversed course. In so doing, it acknowledged in a May 17, 2000, letter that its "[p]rogram staff mistakenly believed that [ ] the two lots in question were part of the parcel that was subdivided for the 18 lot residential subdivision[.]" As reflected in that same letter, the DEP informed Island Venture that, because the two lots in fact were within the marina area subject to the 1989 water-dependent use restriction, the agency could not approve a modification to permit the proposed development. The agency also indicated that, although the property owner could apply for a new permit, "it was unlikely that a CAFRA permit would be issued for a non-water dependent use." Island Venture sought a new permit, which the DEP denied.

The matter proceeded as a contested case before the ALJ. As already indicated, the ALJ found that Island Venture had been a good faith, innocent purchaser of the two lots, and that it had acquired the property without notice of the restriction. Notwithstanding that finding, the ALJ determined that the public policies underlying CAFRA required enforcement of the permit restriction. Citing case law to which he presumably felt bound, the ALJ reasoned that "[Island Venture's] sympathetic plight must yield to the public interest in preserving the use restriction deemed necessary when the 1989 CAFRA Permit was found to be approvable, so long as the adjacent marina site was preserved in perpetuity for a water-dependent use."

The DEP adopted the ALJ's decision, and Island Venture appealed. The Appellate Division reversed in a reported opinion. *Island Venture Assocs. v. NJDEP*, 359 *N.J.Super.* 391, 820 *A.*2d 88 (2003). Although it agreed that there are strong public policy underpinnings to CAFRA, the court concluded that CAFRA had to be viewed in concert with other important statutory provisions,

such as New Jersey's recording statutes (known collectively as the Recording Act), *N.J.S.A.* 46:15–1.1 to 46:26–1. Writing for the unanimous panel, Judge Ciancia stated:

> Certainly, the competing equities here are not between the public interest of the CAFRA statute and the more parochial interests of a private land purchaser. Rather, in our view, the tension is between two very significant public policies as contained in CAFRA and in our public recording statutes. If exceptions continue to be made to our race-notice system of public recordation, it will not be long before that system loses its utility. Nor is such a result necessary to preserve the public policy expressed in CAFRA.
>
> [*Id.* at 398, 820 *A.*2d at 92.]

With those equities in mind, the Appellate Division concluded that "the integrity and reliability of our recording statutes require that Island Venture receive the benefit of its due diligence. Lots 3.03 and 3.04 shall not be restricted to water-dependent uses by virtue of the restrictions placed on Island Venture's predecessor-in-title." *Id.* at 399, 820 *A.*2d at 93. The court also suggested that the circumstances that gave rise to this dispute are not likely to recur because "additional steps have since been taken [by the DEP] to assure proper recordation of CAFRA deed restrictions." *Id.* at 398, 820 *A.*2d at 92.

We granted the State's petition for certification, 177 *N.J.* 576, 832 *A.*2d 326 (2003), and now affirm.

## II.

As the Appellate Division correctly observed, the resolution of this dispute turns on the interplay between CAFRA and the Recording Act. Our task is to balance those seemingly competing statutes in a manner that will preserve, to the extent possible, the significant public policies underlying each enactment.

## A.

■ We begin with CAFRA. No one questions that CAFRA grants wide authority to the DEP to protect and maintain New Jersey's coastal area. As we have stated previously, "[t]he primary purpose of CAFRA is to protect the unique and fragile

coastal zones of the State." *In re Egg Harbor Assocs.*, 94 *N.J.* 358, 364, 464 *A.*2d 1115, 1118 (1983). Within its delegated powers, the DEP is authorized "to regulate land use within the coastal zone for the general welfare." *Ibid.*

Specifically in respect of construction permits, CAFRA provides that the DEP may issue such permits if the agency finds, among other things, that a proposed development "[w]ould result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing public scenic attributes at the site and within the surrounding region." *N.J.S.A.* 13:19–10g. In discharging that function, the DEP may subject a CAFRA permit to the applicant's compliance with conditions. *N.J.S.A.* 13:19–11.

CAFRA also indicates that, once a permit issues, its provisions are intended to apply to landowners and their successors, absent a "change in the nature of the development[.]" *N.J.S.A.* 13:19–14. More particularly, the statute provides that

[i]n the event of rental, lease, sale or other conveyances by an applicant to whom a permit is issued, such permit, with any conditions, shall be continued in force and shall apply to the new tenant, lessee, owner, or assignee so long as there is no change in the nature of the development set forth in the original application. [*Ibid.*]

The statute does not contain any provision requiring the recordation of instruments to bind subsequent titleholders to permit restrictions imposed on prior owners. CAFRA's accompanying regulations, however, authorize the DEP to make filing a permit a condition of the permit itself. *N.J.A.C.* 7:7–1.5 provides, in relevant part: "If required by the [DEP] as a permit condition, the permit shall be filed with the clerk of the county court in which the project site is located as notice to prospective purchasers." The regulation also authorizes the DEP to require permittees to record conservation restrictions. *Ibid.* Case law similarly recognizes that imposing deed restrictions is a proper exercise of the DEP's authority under CAFRA. *In re Protest of Coastal Permit Program Rules*, 354 *N.J.Super.* 293, 367–68, 807 *A.*2d 198, 246–47 (App.Div.2002).

## B.

Like CAFRA, New Jersey's recording statutes address important public policy concerns. We have explained:

"An historical study of the [Recording] Act, as well as an analysis of the cases interpreting it, leads to the conclusion that it was designed to compel the recording of instruments affecting title, for the ultimate purpose of permitting purchasers to rely upon the record title and to purchase and hold title to lands within this state with confidence. The means by which the compulsion to record is accomplished is by favoring a recording purchaser, both by empowering him to divest a former non-recording title owner and by preventing a subsequent purchaser from divesting him of title. This ability to deprive a prior and bona fide purchaser for value of his property shows a genuine favoritism toward a recording purchaser. *It is a clear mandate that the recording purchaser be given every consideration permitted by the law, including all favorable presumptions of law and fact. It is likewise a clear expression that a purchaser be able to rely upon the record title.*"

[*Palamarg Realty Co. v. Rehac*, 80 *N.J.* 446, 453, 404 *A.*2d 21, 25 (1979) (quoting Donald B. Jones, *The New Jersey Recording Act—A Study of Its Policy*, 12 *Rutgers L. Rev.* 328, 329–30 (1957)) (alteration in original) (emphasis added).]

We have observed more recently that in certain contexts "the integrity of the recording scheme is paramount." *Cox v. RKA Corp.*, 164 *N.J.* 487, 497, 753 *A.*2d 1112, 1117 (2000). Thus, this Court has declared: "[A]bsent any unusual equity the stability of titles and conveyancing requires the judiciary to follow that course that will best support and maintain the integrity of the recording system." *Ibid.* (internal quotations marks and citations omitted) (alteration in original).

The Recording Act accomplishes its objectives by providing that "[a]ny instrument affecting title to or interest in real estate ... in this State shall be recorded on presentation to the recording officer of any county in which all or part of the real estate is located," provided the instrument satisfies certain requirements such as inclusion of a signature. *N.J.S.A.* 46:15–1.1. The recorded instrument "shall ... be notice to all subsequent judgment creditors, purchasers, and mortgagees of the execution of the deed or instrument so recorded and of the contents thereof." *N.J.S.A.* 46:21–1.

Importantly, any instrument identified and entitled to be recorded under *N.J.S.A.* 46:16–1, such as deeds or similar instruments affecting title,

shall, until duly recorded or lodged for record in the office of the county recording officer in which the affected real estate or other property is situate, be void and of no effect against subsequent judgment creditors without notice, and against all subsequent bona fide purchasers and mortgagees for valuable consideration, not having notice thereof, whose deed shall have been first duly recorded or whose mortgage shall have been first duly recorded or registered; but any such deed or instrument shall be valid and operative, although not recorded, except as against such subsequent judgment creditors, purchasers and mortgagees.

[*N.J.S.A.* 46:22–1.]

■ As noted, *N.J.S.A.* 46:16–1 sets forth a list of instruments that a party may present to a county officer for recording. A subsequent section, *N.J.S.A.* 46:16–2, expands on that list by providing in broad, general terms, "[a]ll instruments of every kind in anywise affecting the title to any real estate situate in this state, or any interest therein, or containing any agreement in relation thereto, or granting any right or interest therein, may be acknowledged or proved and then recorded[.]" Within that expansive framework, a court will charge a subsequent purchaser with notice of a recorded instrument if it "can be discovered by a 'reasonable' search of the particular chain of title." *Palamarg, supra*, 80 *N.J.* at 456, 404 *A.*2d at 26.

### III.

■ We conclude that, as applied to this case, the policies underlying the Recording Act outweigh those reflected in CAFRA. As a result, Island Venture is not bound to the 1989 water-dependent restriction. Our rationale is threefold. First, the equities clearly favor Island Venture, which did all that was required of it legally or reasonably to determine the existence of the now-disputed restriction. Second, any possible infringement on CAFRA that might result from our holding will be limited in view of the fact that the DEP has taken steps to assure that CAFRA deed restrictions properly are recorded in the future. Third, the recordation of such restrictions is a form of wide notice

that should enhance, rather than encumber, CAFRA's salutary goals.

In respect of the first factor, we need not repeat the ALJ's lengthy observation concerning Island Venture's status as a good faith, innocent purchaser. Suffice it to say that we concur in that observation. We also note that Island Venture, because of its status, appears to be precisely the type of purchaser whom the Legislature sought to protect when enacting the Recording Act. Although this case does not involve competing mortgagees or competing titleholders, it does present a classic example of a bona fide land purchaser who seeks merely to take title free of an encumbrance about which it had no notice. From that vantage point, relieving Island Venture from the restriction comports with the established principle "that the integrity of the recording scheme is paramount." *Cox, supra,* 164 *N.J.* at 497, 753 *A.*2d at 1117.

Regarding any possible infringement on CAFRA apart from this case, we are satisfied that any such effect will be limited or eliminated entirely by the revised practices that the DEP apparently has put in place to assure that CAFRA deed restrictions properly are recorded from this juncture forward. The DEP acknowledges in its brief that it has taken steps presumably to prevent recurring problems of the kind experienced in this case. The agency nevertheless contends, "it remains the case that thousands of permits have been issued since 1973, and that many of those permits and conditions could be disregarded based on the [Appellate Division] decision below."

We are not persuaded by those concerns. First, our holding should not be construed as applying to transactions occurring years ago in which permit questions or challenges have been long settled. In other words, there is no indication in the present record that "thousands of permits" will be affected by this decision. To remove any question in that regard, we state expressly that we intend our holding to apply only to this litigation and to actions commenced, or on appeal, on or after the date of the

Appellate Division's decision, April 11, 2003. See *Cox, supra,* 164 *N.J.* at 514–15, 753 *A.*2d at 1127–28 (outlining relevant principles to be considered when determining whether to give appellate decision prospective effect only).

Second, we stress that our ruling turns on the precise facts before us. Put another way, as with any matter in which competing equities are balanced, our disposition is a product of the totality of circumstances. Hence, a court reviewing a subsequent case involving issues similar to those presented in this case must do so only by applying the same fact-sensitive analysis that we have applied here. For example, the court should consider the circumstances surrounding the failure to record the condition or restriction, the consequences of that failure to the subsequent purchaser, and the particular public interest implicated by the dispute.

Summarizing those equitable considerations in this case, we already have described how Island Venture purchased the property after diligently searching its chain of title via a method designed by the Legislature for that purpose. Additionally, this case involves a two-lot subdivision, which appears relatively small in scope when compared to High Bar's earlier project that had comprised eighteen lots. Our sense is that any environmental disturbance that might result from relieving Island Venture from the 1989 restriction will be similarly limited in scope. (This appeal concerns that single restriction and does not involve any other State or local requirement.) Binding Island Venture to the water-dependent restriction effectively would defeat the entire two-lot project, contrary to the titleholder's expectations as an innocent purchaser of those lots.

More broadly, to the extent that our holding will prompt deed restrictions to be recorded properly to give accurate notice to subsequent landowners, that effect can only strengthen CAFRA in that it will remove or reduce questions regarding the enforceability of legitimately-imposed restrictions. That the DEP's regulations and revised practices appear to seek the same result is an

acknowledgment, in our view, that the agency shares the belief that proper recordation of permit conditions will further CAFRA's objectives.

Urging us to enforce the 1989 restriction, the DEP cites *Aldrich v. Schwartz,* 258 *N.J.Super.* 300, 609 *A.*2d 507 (App.Div.1992). The ALJ also relied heavily on that case in making his determination. In view of the fact that *Aldrich* represents one of the few arguably relevant decisions, we understand why the DEP relies on it (and why the ALJ might have felt bound to it). That said, we are convinced that *Aldrich* does not control the analysis. In that case, a local zoning agency had granted a variance as part of a subdivision approval that reduced the minimum width of an access easement from twenty to fifteen feet. *Id.* at 302, 609 *A.*2d at 508. As a condition for the variance, the agency "required the southerly 45 feet of the new ocean-front lot to remain open and free of structures." *Id.* at 303, 609 *A.*2d at 508.

After a subsequent purchaser took title to the property unaware of the unrecorded restriction, the Appellate Division held that the purchaser was bound to the condition. *Ibid.* In so holding, the Appellate Division acknowledged that the balance of competing interests before it was "not an easy one to strike." *Id.* at 310, 609 *A.*2d at 511. It also noted that the purchaser had other remedies available to him, such as seeking cancellation of the condition before the appropriate zoning board. *Id.* at 310–11, 609 *A.*2d at 511–12. (In contrast, Island Venture in this case was unable to obtain any administrative relief from the DEP absent this litigation.)

The *Aldrich* court also was concerned that a contrary ruling would upset longstanding practices within municipalities regarding variance conditions. *Id.* at 310, 609 *A.*2d at 511. The panel explained: "Our holding that [the] plaintiff is bound by the [prior] restriction is dictated by land planning considerations, and by the danger that a decision devitalizing long-standing variance conditions may prejudice existing development and the zoning plan of some towns and neighborhoods." *Ibid.*

Those concerns are not readily imported to the circumstances of this case. In that respect, we agree with Judge Ciancia, who distinguished *Aldrich* as follows:

> [U]nlike in *Aldrich*, we are not dealing with the potential for innumerable restrictions established by hundreds of municipalities. We are dealing with a state agency charged with the enforcement of a statute that addresses specifically defined geography. *See N.J.S.A.* 13:19-4. As far as the present record reveals, the DEP has made efforts to assure the recording of deed restrictions that are required by the CAFRA permitting process. The breakdown here was that the master deed incorrectly stated the area restricted, and [the] DEP either made no independent investigation to assure that the master deed accurately reflected the area of restriction or, at best, it failed in that endeavor. Had the master deed properly set out the restriction on the land that later was denominated as lots 3.03 and 3.04, a diligent search of title would have discovered the restriction and Island Venture would have been bound thereby. At oral argument we were informed by the Attorney General that additional steps have since been taken to assure proper recordation of CAFRA deed restrictions.
>
> Thus, we need not extend *Aldrich* to the present facts in order to reach an equitable accommodation of the competing legitimate interests. CAFRA and the public recording statutes can co-exist without detriment to either's public policy interests.
>
> [*Island Venture, supra*, 359 *N.J.Super.* at 398–99, 820 *A.*2d at 92–93 (footnote omitted).]

In the same vein, while we intend no criticism of the DEP, we cannot help but observe that, as compared to Island Venture, the DEP was in a superior position to know of the CAFRA restriction and to assure its enforceability. Yet, when it corresponded in 1991 with High Bar, and when it initially believed several years later that Island Venture's property lay outside the marina area, the DEP seemed unaware that the water-dependent restriction applied to Lots 3.03 and 3.04. When there is that much uncertainty or confusion affecting the integrity of land titles, equity requires that an innocent purchaser prevail. *Cf. Lacey Mun. Util. Auth. v. NJDEP*, 162 *N.J.* 30, 39–40, 738 *A.*2d 955, 960–61 (1999) (explaining as matter of fairness that uncertainty surrounding DEP regulations required expansive reading of statute of limitations to allow claim against spill fund).

Lastly, the DEP itself appears to have invoked or relied on the Recording Act when it imposed the original restriction to the Master Deed. From that perspective, we disagree with the agen-

cy's statement in its brief that "[t]he Appellate Division acknowledged the language of *N.J.S.A.* 13:19–14 [pertaining to the application of CAFRA conditions on subsequent owners], but then gave it no effect[.]" In our view, the court below reached its decision not, as the DEP suggests, by disregarding CAFRA or diminishing its importance, but rather by balancing CAFRA's policy interests against those reflected in the Recording Act. We do the same here. In striking the balance in favor of the innocent purchaser in this case, we are confident that our holding ultimately will preserve the significant policy objectives underlying each statute.

## IV.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, concurring.

I fully concur in the opinion of the Court and add only this brief observation. I do not construe the Court's opinion to conclude that *Aldrich v. Schwartz*, 258 *N.J.Super.* 300, 609 *A.*2d 507 (App.Div.1992), was decided correctly, because the issue raised in *Aldrich* was not before us. I only construe the opinion to hold that *Aldrich* is distinguishable from the present case.

Justice LONG joins in this opinion.

For affirmance—Chief Justice PORTIZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—6.

Opposed—None.