864 A.2d 1160

NEAL K. MINTZ, HAROLD TORKELSEN, AND JANET TORKEL-
SEN, PLAINTIFFS–RESPONDENTS, v. TOWNSHIP OF MILL-
STONE, AND TOWNSHIP OF MILLSTONE PLANNING BOARD,
DEFENDANTS–APPELLANTS, AND MICHELLE ORLICK,
PROPOSED INTERVENOR–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 6, 2004—Decided January 21, 2005.

Before Judges WEFING, PAYNE and C.S. FISHER.

*Lani M. Lombardi* argued the cause for appellant Millstone Township Planning Board (*Cleary, Alfieri, Grasso & Hoyle,* attorneys; *Salvatore Alfieri,* of counsel; *Ms. Lombardi,* on the brief).

*Erin E. Kurowicki* argued the cause for proposed intervenor-appellant Michelle Orlick (*The Galvin Law Firm,* attorneys; *Ms. Kurowicki* and *Dennis M. Galvin,* on the brief).

*William A. Miller* argued the cause for respondent Neal K. Mintz.

*Lomurro, Davison, Eastman & Munoz,* attorneys for appellant Millstone Township, relied upon the brief filed by appellant Millstone Township Planning Board.

The opinion of the court was delivered by

FISHER, J.A.D.

The trial judge determined that the Millstone Township Planning Board arbitrarily denied plaintiff Neal K. Mintz's application

for subdivision approval. In denying the application, the board relied upon its belief—based upon the memories of some residents, and an ambiguous at best, erroneous at worst, reference in its records—that a condition of its approval of Mintz's predecessor's application was a restriction on any further subdivision. Because we agree with the trial judge's conclusion that this alleged restriction was neither memorialized nor recorded and, as a result, should not be enforced, we affirm.[1]

The property in question consists of two separate six-acre lots—one owned by Mintz and the other by Harold and Janet Torkelsen (Torkelsen)—that were once part of an approximately seventy-acre tract owned by David and Grace Antonowsky (Antonowsky). The Mintz and Torkelsen lots were created in 1980 when Antonowsky obtained approval to subdivide his seventy acres into twelve lots.[2] Proposed intervenor Michelle Orlick owns another of the lots subdivided from Antonowsky's seventy-acre tract. In 2002, Mintz filed applications with the board, seeking to subdivide two of the six-acre lots that were created by Antonowsky's subdivision in 1980—lot 2.01 that he owns and lot 2.02 that he was under contract to purchase from Torkelsen—into four three-acre lots.

The applications complied with all zoning requirements, but the board determined, after hearing testimony on three different occasions, that any further subdivision of these lots was prohibited by an earlier restriction. This restriction was not contained in the ordinance that approved the Antonowsky subdivision, in the subdivision deed thereafter filed by Antonowsky, or in any deed by which Antonowsky thereafter conveyed any of the other lots to

---

[1] The board's appeal of the September 16, 2003 judgment vacating its denial of Mintz's application was assigned Docket No. A–1419–03T5. Michelle Orlick's appeal of both the April 17, 2003 order denying her motion to intervene and the September 16, 2003 judgment was assigned Docket No. A–1339–03T5. We consolidated these appeals by order entered on January 12, 2004.

[2] Nine of the lots then created consisted of six acres; one consisted of 4.38 acres, another 5.52 acres, and the last 8.1 acres.

others. Nevertheless, the board concluded that such a restriction was imposed at the time Antonowsky's application was approved and should be enforced to defeat Mintz's application. The board reached this determination through its reliance upon anecdotal evidence, including the memories of individuals as to what they believed occurred when Antonowsky's application was granted in 1980.

For example, it was undisputed that the minutes of the September 24, 1980 board meeting do not reveal that a restriction on any further subdivision was ever placed on the lots resulting from the Antonowsky subdivision:

> Mr. [and] Mrs. Antonowsky and Mr. Bruce Rittenhouse, Engineer, were present for this second review of a 12 lot subdivision. Taxes are paid to date. Approvals have been received from Monmouth County and East Windsor Township Planning Boards. The application qualifies as a minor subdivision as the proposed lots contain 6 acres except for one lot within each original tract of land. Map shows that road widening is given to create a 50 foot right of way for all Township roads. After review by the Board, Mr. Hudson asked that a motion be made for approval of the application subject to the Board Engineer's request for a 25 foot radius on the corners of Gordon and Nurko Roads and for road widening. Mr. Littman so moved for approval. Motion was seconded by Mayor Abate. Roll call vote indicated approval by the six Board Members present.

However, under the "New Business" section of the minutes of the October 8, 1980 meeting, it was stated that

> The application of Sub 23–80 (Sands) was discussed. Mayor Abate asked that a restriction be put on the map that these lots will not be further subdivided. It was so decided by the Board.

While "Sub 23–80" is the identification number assigned by the board to an application by someone named Sands and not Antonowsky, whose application was numbered "Sub 22–80," in considering Mintz's application the board took the position that the minutes' erroneous reference to Sands and his application actually related to the Antonowsky application. Thus, through this inaccurate reference in the minutes of the October 8, 1980 board meeting, the board concluded that further subdivision of the Antonowsky lots was precluded.

In addition, the board relied upon the statements of persons in the community that the intent underlying the 1980 Antonowsky

subdivision was that each subdivided lot remain a six-acre "far-mette." One board member also indicated that he "remembered" that this was the intention of the board in granting Antonowsky's application. Michelle Orlick[3] testified that other owners of the Antonowsky lots "were under the belief," as a result of what they were told, "that there could be no further subdivision of these mini farms." She also told the board of her attempts to locate the "subdivision folder" created at the time of Antonowsky's application. On November 13, 2002, Orlick testified that the subdivision folder had not been located but that

[T]he evidence is definitely building, that there is a resolution on its original minor subdivision. We have the information that the residents were given on purchase, the memories of two members of the board that have nothing to do with this purchase. Notation in the left-hand column from 9/24/80 minutes, that there is a resolution and the resolution in the minutes of 10/8/80 that has the right sub number and the wrong name.

On another occasion, the board heard from a purchaser of one of the Antonowsky lots that he was told it could not be further subdivided. Yet another owner testified that the reason he purchased his property within the Antonowsky subdivision was because he had been told it was not further sub-dividable.

On the last occasion the matter was before the board, Orlick again reiterated her hearsay information but conceded that "[t]he only thing that I do lack is evidence in the form of the resolution itself or the original subdivision map marked with the restriction to further subdivide." The board also then heard the recollections of others that Antonowsky had said the land could not be further subdivided. After hearing this, the board received instructions from its attorney,[4] and then openly discussed the fact that the

---

[3] We note that Michelle Orlick unsuccessfully moved to intervene in the Law Division proceedings in this matter. While we conclude that the judge mistakenly denied that motion, we also find no resulting prejudice because Orlick was able to participate in the proceedings before the board and in this court.

[4] The attorney then said: "You still, as this board, ha[ve] to decide whether that resolution was in place or not based upon the testimony that was presented to you this evening. If you are of the opinion that it was not in place, the

restriction on further subdivision was not located in any deed, causing a board member to indicate what the record reflected—that "[t]here is no restriction of any nature in the title binder which would show up whether it's a filed map, deed, anything." This again prompted the submission of further unrecorded recollections. One board member, who was on the board in 1980, stated that he recalled "this was the first farm that we approached that these lots would not be further subdivided [and] I think Charlie Abbott would agree with me." Abbott then responded:

[T]he lot I bought in 1977 was also a six acre lot. When I bought it was not that there was any restrictions, and like these other folks, there is no restriction on my deed. However, a year or two after that I was told that the intention was that on all the six acre lots that were created on Paint Allen Springs Road that the intent was not to subdivide them, but they didn't put it in writing.

Mintz's attorney continued to argue, as during the earlier hearings, that the evidence offered in opposition to the application was hearsay, that no deed contained a restriction, and that no resolution existed, which would preclude a further subdivision. The board nevertheless concluded that "based upon the minutes, there appears to be an indication ... that the resolution does exist," and, as a result, rejected Mintz's application for the subdivision of his own property and the Torkelsen property he had contracted to purchase.

The best that can be said about the existence of the alleged restriction is that a resolution to restrict the further subdivision of the property may have been discussed by the board in 1980 or there may have then been an intention on the part of the board, never memorialized, to impose a restriction as part of its approval of Antonowsky's subdivision application. There is no question, however, that the only writing suggested by the board as constituting a memorialization of the alleged intention to restrict the further subdividing of the property is the comment in the minutes of October 8, 1980 that refers to a different application but which

---

restriction [or] the resolution, then you have to grant the approval. If you determine that it was in place, then it is ... more difficult ... because the case law is very unclear."

the board now contends was intended to refer to Antonowsky's application. There is no dispute but that a purchaser of an Antonowsky lot, conducting a diligent search of the chain of title, would not learn of this alleged restriction. Indeed, as the evidence heard by the board indicates, the only way a purchaser of one of these lots could gain knowledge of this alleged restriction would be through the testimony of neighbors and the decoding of a typographical error in the minutes of a board meeting that occurred over twenty years earlier.

In a recent decision, our Supreme Court has considered the competing interests presented when a governmental agency imposed a limitation on the use of land that could not be learned through a diligent search of the chain of title. In considering this circumstance, the Court also raised doubts about the viability of an earlier decision of this court upon which the board and Orlick greatly rely.

In *Island Venture Associates v. N.J. Dep't of Envtl. Prot.*, 179 *N.J.* 485, 494, 846 *A.*2d 1228 (2004), the Court held that a purchaser of property that had been restricted, by way of "an encumbrance about which [the purchaser] had no notice," despite exercising due diligence in searching the chain of title prior to its purchase, could not be bound by that unknown and unknowable encumbrance. In that case, the Court considered whether Island Venture Associates (Island Venture) was bound by earlier memorializations of restrictions on Lots 3.03 and 3.04. These lots were previously owned by High Bar Harbor Development Company (High Bar) and purchased by Island Venture at an auction in 1994.

The record reflected that High Bar had sought the approval required by the Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19–1 to –33, from the Department of Environmental Protection (DEP) in 1988 to construct eighteen single-family dwellings in Long Beach Township. The DEP provided a CAFRA permit conditioned upon the DEP's approval of the language of a deed restriction that would restrict other lots—designated as Block Y–12, Lot 3, 3.01, 4.01, 4.02, 4.08, 4.09 and 16—so that they

would remain "a water dependent use in perpetuity." *Id.* at 487, 846 *A.2d* 1228. High Bar recorded the required form of deed with the county clerk's office in 1990, a portion of which stated, with the DEP's approval, "[t]he Condominium Property shall remain a water-dependent use in perpetuity." The Court then explained what later occurred as follows:

> After High Bar had obtained the CAFRA permit, it submitted a minor subdivision application to the appropriate local zoning agency, seeking approval to subdivide Block "25.12 (formerly Y–12) Lots 3.01 and 3.02." (Apparently, Lot 3.02 was designated as that number after previously being known as Lot 3.). The subdivision was approved, establishing several lots, including Lots 3.03 and 3.04 which are the subject of this dispute.
>
> Sometime in 1991, High Bar inquired of the DEP whether construction on the newly subdivided parcels, Lots 3.03 and 3.04, required a CAFRA permit. Along with that inquiry, High Bar also submitted for the DEP's review the minor subdivision site plan. High Bar received a response by letter dated March 18, 1991, from the DEP's Division of Coastal Resources. The letter states, in part: "No coastal permits required, provided no construction to take place in wetlands." The letter makes no reference to the 1989 water-dependent restriction.
>
> [*Id.* at 487, 846 *A.2d* 1228.]

In light of these occurrences, the title search obtained by Island Venture revealed the water-dependent restriction contained in the deed recorded in 1990 but did not identify any restriction affecting the lots it had purchased.

After the purchase, Island Venture applied to Long Beach Township for construction permits to build single-family residences on Lots 3.03 and 3.04. When the township asked whether the 1989 CAFRA permit would allow for the construction, the DEP, initially believing these lots were part of the non-marina residential area contained within High Bar's original eighteen-lot proposal, suggested that Island Venture apply for a modification of the earlier permit. Later, it "reversed course," and advised that because Lots 3.03 and 3.04 were part of the marina area in the original proposal, a modification would not be permitted. *Id.* at 489, 846 *A.2d* 1228. After a hearing, an administrative law judge determined that Island Venture was a good faith purchaser of the lots without notice of the restriction but that the public policies embodied in CAFRA required enforcement of the permit

restriction. We reversed that determination. *Island Venture Assocs. v. N.J. Dep't of Envtl. Prot.*, 359 *N.J.Super.* 391, 820 *A.*2d 88 (App.Div.2003).

In affirming, the Supreme Court described the conflict presented by these circumstances between CAFRA and the Recording Act, *N.J.S.A.* 46:15–1.1 to 46:26–1. The Recording Act's purposes are evident from certain of its provisions, most notably the juxtaposition between *N.J.S.A.* 46:21–1 (which states that a recorded instrument "shall . . . be notice to all subsequent . . . purchasers . . . of the deed or instrument so recorded and of the contents thereof") and *N.J.S.A.* 46:22–1 (which states that any instrument, until duly recorded, "shall . . . be void and of no effect against . . . all subsequent bona fide purchasers . . . not having notice thereof. . . ."). In further defining the terms of these statutes, the Court has also held that a subsequent purchaser shall be charged with notice of a recorded instrument if it "can be discovered by a 'reasonable' search of the particular chain of title." *Palamarg Realty Co. v. Rehac*, 80 *N.J.* 446, 456, 404 *A.*2d 21 (1979).

Considering the relevant provisions of the Recording Act, as well as its own prior declaration that "the integrity of the recording scheme is paramount," *Cox v. RKA Corp.*, 164 *N.J.* 487, 497, 753 *A.*2d 1112 (2000), the Court in *Island Venture* emphasized the fact-sensitive nature of conflicts between the interests of the regulating authority in obtaining enforcement of its land use restrictions and the equities inuring to the innocent purchaser. In resolving future fact-sensitive conflicts, the Court directed that courts consider "the circumstances surrounding the failure to record the condition or restriction, the consequences of that failure to the subsequent purchaser, and the particular public interest implicated by the dispute." 179 *N.J.* at 495, 846 *A.*2d 1228. As those considerations were then applied, the Court found persuasive Island Venture's diligent search, the minor environmental impact that would result if the 1989 restriction were not applied to Lots 3.03 and 3.04, and the fact that "[t]his appeal concerns that

single restriction and does not involve any other State or local requirement." *Ibid.*

*Aldrich v. Schwartz,* 258 *N.J.Super.* 300, 609 *A.*2d 507 (App.Div. 1992), upon which the board and Orlick greatly rely, presents a similar problem. There, the board of adjustment granted subdivision approval on the condition that a portion of the new oceanfront lot created by the subdivision remain open and free of structures. *Id.* at 303, 609 *A.*2d 507. This restriction was not recorded. When an unaware subsequent purchaser sought to avoid the impact of the restriction, we were required to consider which of the competing interests, presented by the Recording Act and the local board's power to limit the use of this property, should be favored. Recognizing that the balance of these competing interests was "not an easy one to strike," we ruled against the purchaser, concluding that the binding of plaintiff to the unrecorded restriction was "dictated by land planning considerations, and by the danger that a decision devitalizing long-standing variance conditions may prejudice existing development and the zoning plan of some towns and neighborhoods." *Id.* at 310, 609 *A.*2d 507.

In our decision in *Island Venture,* we distinguished *Aldrich,* finding the quandary similar but the facts sufficiently different to require the opposite result. 359 *N.J.Super.* at 398–99, 820 *A.*2d 88 ("[U]nlike in *Aldrich,* we are not dealing with the potential for innumerable restrictions established by hundreds of municipalities.... [W]e need not extend *Aldrich* to the present facts in order to reach an equitable accommodation of the competing legitimate interests."). The Supreme Court in *Island Venture* adopted the manner in which we distinguished *Aldrich,* while giving no indication as to whether *Aldrich* should be overruled. 179 *N.J.* at 497, 846 *A.*2d 1228. Of interest to a consideration of whether *Aldrich* remains viable is the fact that Justice Albin stated in a short separate opinion, joined by Justice Long, that he did "not construe the Court's opinion to conclude that *Aldrich* ... was decided correctly, because the issue raised in *Aldrich* was not before us. I only construe the opinion to hold that *Aldrich* is

distinguishable from the present case." 179 *N.J.* at 498, 846 *A.*2d 1228. While we need not now consider whether *Aldrich* remains viable, there is little doubt that *Island Venture* has at least limited *Aldrich* to its particular facts and that *Aldrich's* holding should not be viewed expansively.

■ We similarly distinguish *Aldrich* from the present circumstances. Here, unlike *Aldrich,* the restriction was never memorialized in any understandable fashion. The best evidence of its existence lies only in an alleged erroneous reference in the board's minutes of October 8, 1980. Otherwise, the alleged restriction existed only in the twenty-year old memories of some board members and the hearsay information provided by other residents. The board's actions in attempting to create this alleged restriction are so wanting that we are required to conclude that we need not weigh the competing interests in the fashion described in *Island Venture.* There need only be a weighing of these competing interests when a local agency has at least memorialized its ruling. A "deed restriction of the mind," such as that found by the board to exist, cannot be enforced.

■ While not necessary to our decision, we also conclude that even if we were to assume this alleged, incorporeal restriction on further subdivisions could have any further application to the future use of the Antonowsky lots, we are satisfied that the application of the factors outlined in *Island Venture* would compel a determination that the policies of the Recording Act outweigh the right of the local agency in this instance. This analysis, as the Supreme Court has held, requires a weighing of "the circumstances surrounding the failure to record the condition or restriction, the consequences of that failure to the subsequent purchaser, and the particular public interest implicated by the dispute." *Id.* at 495, 846 *A.*2d 1228. In applying these factors, we agree with the trial judge that the balancing of the equities requires that Mintz, as legal owner of lot 2.01, and as equitable owner of lot 2.02, see *Courtney v. Hanson,* 3 *N.J.* 571, 575, 71 *A.*2d 192 (1950);

*In re Estate of Yates,* 368 *N.J.Super.* 226, 235, 845 *A.2d* 714 (App.Div.2004), should not be bound by this phantom restriction.

In undertaking the *Island Venture* "fact-sensitive analysis," of particular interest, again, is the absence of any writing memorializing the alleged restriction. As the trial judge correctly observed, "[n]one of the parties w[as] able to locate either (1) a deed restriction precluding further subdivision of the twelve lots; (2) a copy of the Antonowsky subdivision map; or (3) a copy of the resolution granting the Antonowsky subdivision." If it is assumed that the board vocally indicated in 1980 that the approval of Antonowsky's subdivision application was conditioned upon a restriction on any future subdivision, the board never issued a resolution and, moreover, the only evidence in the minutes of the board's meetings offered to suggest the intent to impose such a restriction is the completely erroneous reference to another application together with the explanation that this misnomer was intended to refer to Antonowsky's application. The absence of the subdivision map which should have been filed with the appropriate county officer pursuant to *N.J.S.A.* 40:55D–52 is also telling. We intend no undue criticism of the board, but, if the board truly had intended to restrict any further subdivision of the property, the record overwhelmingly demonstrates its lack of care in memorializing that restriction and in insuring its future enforcement.

The impact brought about through the enforcement of this unmemorialized and unrecorded restriction—the second factor mentioned in *Island Venture*—is readily apparent. Mintz purchased lot 2.01 with no understanding or reason to believe that its further subdivision was restricted. As a result, the hardship to be suffered by Mintz if lot 2.01 is bound to this alleged restriction is palpable. We do not understand the board or Orlick to argue otherwise.

On the other hand, the board and Orlick argue that there is significance in the fact that Mintz obtained legal title to lot 2.02 when Torkelsen transferred to him a deed dated July 10, 2003—seven months after the board's decision and while this action was

still pending in the Law Division. We are not persuaded that these facts have relevance to the hardship referred to in *Island Venture*. The fact remains that when Mintz applied for subdivision approval he was the equitable owner of lot 2.02 and his application was denied by the board before he took legal title. We do not understand how any action taken by Mintz—after the board rendered its arbitrary decision—could impact upon the legitimacy of that decision. The facts important to this aspect of the *Island Venture* analysis stem from what Mintz knew or could reasonably have learned when he became the equitable owner, not the legal owner, of lot 2.02. The record does not indicate that Mintz had access to information from which he should have assumed the possibility that further subdivision of lot 2.02 might have been precluded upon contracting with Torkelsen. Even if Mintz had knowledge of a rumor about an un-memorialized and unrecorded restriction on this property, that would be inadequate to dispel the hardship that would be caused Mintz if, as a result of the enforcement of the alleged restriction, he would lose the benefit of his contract with Torkelsen, i.e., subdividable property. Even if he were still only the equitable owner of lot 2.02, the enforcement of this alleged restriction would have created a hardship by causing Mintz to either rescind the contract or close on property that no longer had the qualities he had rightly assumed it possessed.

We also conclude that the determination that this alleged restriction should not be enforced has only a limited impact on the public. The Mintz application does not require any variance relief, a fact which also distinguishes it from *Aldrich*. Accordingly, the creation of subdivided lots, all of which conform to applicable zoning requirements, as the trial judge correctly observed, "can hardly be found to threaten the zoning and planning scheme of the municipality." Instead, the only landowners affected by approval of the Mintz application are those who own lots within the former Antonowsky tract who may have purchased on the understanding, learned from sources other than what their title searches revealed, that there could be no further subdivision of their property or any

other lots in the Antonowsky tract. Thus, like *Island Venture*, where the Court recognized the limited environmental impact resulting from permitting the development of two lots, we conclude that the trial judge correctly recognized the limited impact resulting from a reversal of the board's determination does not provide an ample basis to override the policies of the Recording Act.

Accordingly, while we conclude that the absence of any writing that reliably memorialized the creation of this alleged restriction precludes its enforcement and negates any need to employ the weighing process established in *Island Venture*, we also determine that the utilization of that weighing process favors the enforcement of the policies of the Recording Act and the sublimation of the board's authority to restrict the use of property within its jurisdiction. As a result, because the board's rejection of Mintz's application rested solely on its enforcement of the unenforceable incorporeal restriction on the further subdivision of the Antonowsky lots, we agree with the trial judge that the board's ruling was arbitrary, capricious and unreasonable.

The orders under review in Docket No. A–1339–03T5 and A–1419–03T5 are affirmed.